**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

—————————

No. 16-4234

—————————

READING HEALTH SYSTEM

v.

BEAR STEARNS & CO., n/k/a
J.P. MORGAN SECURITIES LLC,

Appellant

—————————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D. C. Civil Action No. 5-15-cv-01412)
District Judge: Honorable Lawrence F. Stengel

—————————

Argued on October 10, 2017
Before: SHWARTZ and ROTH, Circuit Judges and
*PAPPERT, District Judge

———————————

* The Honorable Gerald J. Pappert, United States District
Judge for the Eastern District of Pennsylvania, sitting by
designation.

(Opinion filed  August 7, 2018)


Jonathan K. Youngwood, Esq.          (**ARGUED**)
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017


          Counsel for Appellant


Mark A. Strauss, Esq.          (**ARGUED**)
Thomas W. Elrod, Esq.
Peter S. Linden, Esq.
Kirby McInerney LLP
825 Third Avenue, 16th Floor
New York, NY 10022


          Counsel for Appellee

Robert C. Port, Esq.
Gaslowitz Frankel LLC
303 Peachtree Street, N.E.
Suite 4500
Atlanta, GA 30308


          Counsel for Amicus Appellee
          Public Investors Arbitration Bar Association

          _____


          OPINION
          _____

ROTH, Circuit Judge.

## INTRODUCTION

In this case, we address an emerging trend in the brokerage industry. Ordinarily, broker-dealers, as members of the Financial Industry Regulatory Authority (FINRA),[1] are required by FINRA Rule 12200 to arbitrate all claims brought against them by a customer. Seeking to avoid this obligation to arbitrate, broker-dealers have begun inserting forum-selection clauses in their customer agreements, without mentioning the customer's right to arbitrate. This practice, which has been condoned by several of our sister circuits, deprives investors of the benefits associated with using FINRA's arbitral forum to resolve brokerage-related disputes.

This case concerns such a forum-selection clause. Over the course of several years, Bear Stearns & Co., now known as J.P. Morgan Securities LLC (hereinafter J.P. Morgan), a broker-dealer and FINRA member, executed several broker-dealer agreements with Reading Health System. The agreements were executed in connection with four separate offerings of auction rate securities (ARS), through which Reading issued more than $500 million in debt.[2] Two of those contracts included forum-selection

---

[1] FINRA is a self-regulatory organization (SRO) that is statutorily authorized "to exercise comprehensive oversight over all securities firms that do business with the public." *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 737 (9th Cir. 2014) (internal quotation marks omitted).

[2] In simplified terms, ARS are long-term bonds (or preferred securities) that pay either interest or dividends to the bondholders at rates set by periodically held "Dutch"

3

clauses providing that "all actions and proceedings arising out of" the agreements or underlying ARS transactions had to be filed in the District Court for the Southern District of New York.

After the ARS market collapsed, Reading filed a statement of claim with FINRA, alleging that J.P. Morgan engaged in unlawful conduct in connection with the ARS offerings and demanding that those claims be resolved through FINRA arbitration. J.P. Morgan refused to arbitrate, however, contending that Reading had waived its right to arbitrate by agreeing to the forum-selection clauses. To resolve this standoff, Reading filed a declaratory judgment action to compel FINRA arbitration in the District Court for the Eastern District of Pennsylvania. In response, J.P. Morgan moved to transfer the action to New York, based on the forum-selection clauses in some (but not all) of the broker-dealer agreements. The District Court denied the motion to transfer the action and ordered J.P. Morgan to submit to FINRA arbitration. We will affirm both rulings.

## BACKGROUND

### I.     Factual Background

Reading is a not-for-profit health system located in Berks County, Pennsylvania. Reading issued ARSs on four occasions in 2001, 2003, 2005, and 2007, offering a total of more than $500 million in debt to finance capital projects relating to the Reading Hospital and Medical Center Project.

---

auctions. *See Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 102 (2d Cir. 2012).

4

J.P. Morgan served as the underwriter and broker-dealer for each offering. The parties executed separate broker-dealer agreements in connection with each of the four ARS offerings.

Over time, the ARS offerings did not go as planned for Reading. Reading claims that J.P. Morgan and other broker-dealers artificially propped up the ARS market through undisclosed support bidding that created a false appearance of market demand for ARSs. Allegedly, when the broker-dealers stopped propping up the market in early 2008, the ARS market collapsed. As a result, Reading filed various state law claims against J.P. Morgan relating to the ARS offerings and demanded that those claims be arbitrated before FINRA.

This appeal does not require us to examine the propriety of J.P. Morgan's handling of the ARS offerings or to apportion fault for the collapse of the ARS market. Rather, we are asked to resolve only the parties' threshold disputes regarding the proper venue in which to adjudicate Reading's action to compel arbitration and the venue for Reading's substantive claims against J.P. Morgan.

To do so, we must examine the four broker-dealer agreements. Each of the agreements included a New York choice-of-law clause.[3] Both the 2001 and 2002 broker-dealer agreements were executed by J.P. Morgan and Bankers Trust (as auction agent); Reading did not sign either agreement.[4]

---

[3] J.A. 95, 120, 165, 187.

[4] J.A. 154-67 (2001 broker-dealer agreement); 175-88 (2002 broker-dealer agreement).

5

Neither agreement includes a forum-selection clause. The 2005 broker-dealer agreement was executed by Reading Health, J.P. Morgan, and Deutsche Bank Trust Company Americas.[5] The 2007 agreement was executed by the same three parties, as well as the Berks County Municipal Authority.[6] Both the 2005 and 2007 agreements contain a forum-selection clause that provides, in relevant part, as follows:

> The parties agree that all actions and proceedings arising out of this Broker-Dealer Agreement or any of the transactions contemplated hereby shall be brought in the United States District Court in the County of New York and that, in connection with any such action or proceeding, submit to the jurisdiction of, and venue in, such court.[7]

J.P. Morgan asserts that the forum-selection clauses in these agreements required Reading to file both its declaratory action to compel arbitration and its substantive claims in the District Court for the Southern District of New York.

---

[5] J.A. 79-96.

[6] J.A. 106-24.

[7] J.A. 95, 120. There are distinctions between the two clauses that are immaterial to this appeal. For example, the 2007 agreement, unlike the 2005 agreement, provides that all actions and proceedings shall be "brought in the County of New York," without explicitly referring to federal court. Both agreements explicitly provide that the parties waive any right to a jury trial but do not mention waiver of the right to arbitration. *Id.*

## II.    Procedural Background

In February 2014, Reading filed a statement of claim with FINRA, asserting claims against J.P. Morgan relating to the ARS offerings and demanding that J.P. Morgan arbitrate those claims in FINRA's arbitral forum.[8]   That demand was made pursuant to FINRA Rule 12200, which requires a FINRA member, such as J.P. Morgan, to arbitrate any dispute with a customer, such as Reading, at the customer's request. J.P. Morgan refused to arbitrate.  In J.P. Morgan's view, the forum-selection clauses in the 2005 and 2007 broker-dealer agreements constituted a waiver of Reading's right to arbitrate under FINRA Rule 12200.[9]

In March 2015, Reading filed a single-count declaratory judgment action in the District Court for Eastern District of Pennsylvania.[10]   The following day, Reading moved to compel arbitration of the claims it had filed with FINRA, arguing that it was entitled to arbitrate those claims

---

[8] Reading's statement of claim pleaded several state law causes of action against J.P. Morgan, including fraud, negligent misrepresentation, and breach of fiduciary duty and other rule-based duties.  J.A. 206-34.

[9] Recognizing that they had reached an impasse, the parties agreed to stay the FINRA arbitration pending the Second Circuit's resolution of a near-identical arbitrability issue.  J.A. 235-36.  As discussed below, the Second Circuit eventually endorsed the view that the forum-selection clauses supersede the right to arbitrate under FINRA Rule 12200.  *See Goldman, Sachs & Co. v. Golden Empire Schools Fin. Auth.* (*Golden Empire*), 764 F.3d 210, 212 (2d Cir. 2014).

[10] J.A. 13-22.

pursuant to FINRA Rule 12200.  Invoking the forum-selection clauses in the 2005 and 2007 broker-dealer agreements, J.P. Morgan filed two motions:  a motion to transfer the declaratory judgment action to the Southern District of New York and, in the event transfer was denied, a cross-motion to enjoin the FINRA arbitration.

In February 2016, the District Court issued a single order (i) denying J.P. Morgan's motion to transfer, (ii) granting Reading's motion to compel, and (iii) denying J.P. Morgan's cross-motion to enjoin.[11]  The court declined to transfer the declaratory judgment action to New York because, in its view, the forum-selection clauses did not designate the forum in which Reading should seek to compel arbitration.  The court then required J.P. Morgan to submit to arbitration because it concluded that FINRA Rule 12200 granted Reading the right to arbitrate; this right was not overridden by the forum-selection clauses.

After we dismissed J.P. Morgan's initial appeal on jurisdictional grounds, the District Court granted J.P. Morgan's motion to certify the following question for interlocutory review:

> [W]hether the United States Supreme Court decision in *Atlantic Marine Construction Company, Inc. v. United States District Court for the Western District of Texas*, 134 S. Ct. 568 (2013), requires a district court to enforce a forum selection clause by transferring a declaratory action seeking to compel arbitration,

---

[11] J.A. 3-4.

> even if the district court determines that the forum selection clause does not cover the underlying arbitration that the plaintiff seeks to compel.[12]

We then granted J.P. Morgan's petition for permission to appeal under 28 U.S.C. § 1292(b).

## III.    Regulatory Background

Reading bases its right to arbitrate its disputes with J.P. Morgan on FINRA's compulsory arbitration rule.

FINRA is an independent, self-regulatory organization (SRO) established pursuant to Section 15A of the Securities Exchange Act, which "created a system of supervised self-regulation in the securities industry."[13]  FINRA is authorized to "exercise comprehensive oversight over 'all securities firms that do business with the public,'"[14] including J.P. Morgan and other broker-dealers that participated in the now-defunct ARS market.  In its capacity as a securities regulator, FINRA has promulgated various rules governing the brokerage industry, many of which are designed to protect investors who conduct business with FINRA-regulated

---

[12] J.A. 5, 348, 350; *see* 28 U.S.C. § 1292(b).

[13] *Credit Suisse First Boston Corp. v. Grunwald*, 400 F.3d 1119, 1128 (9th Cir. 2005).

[14] *City of Reno*, 747 F.3d at 737 (quoting *UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc*., 660 F.3d 643, 648 (2d Cir. 2011); 72 Fed. Reg. 42,169, 42,170 (Aug. 1, 2007)); *see* 15 U.S.C. § 78o(b)(8) (requiring broker-dealers to be FINRA members).

firms.[15]   The Securities and Exchange Commission (SEC), which is statutorily authorized to oversee FINRA, must approve all such rules.[16]  A FINRA member agrees to comply with all of FINRA's rules and is thus bound to adhere to FINRA's Code and its relevant arbitration provisions.[17]

FINRA's authority includes regulatory oversight over securities arbitration.[18]  Indeed, "[t]he SEC has long viewed the option of securities arbitration for investors as an

---

[15] *See* 15 U.S.C. § 78o-3(b)(6) (requiring FINRA to adopt rules designed, *inter alia,* to "prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, . . . and, in general, to protect investors and the public interest").

[16] 15 U.S.C. § 78s(b)(1)-(2); 17 C.F.R. § 200.30-3(a)(12); *see* Amicus Brief of Pub. Invests. Arb. Bar Assoc. (PIABA Br.), at 9-10 (outlining FINRA rulemaking process).

[17] FINRA Rule 140 (Applicability); FINRA Bylaws, art IV, § 1 (Membership); *see, e.g.*, *W. Va. Univ. Hosps., Inc.*, 660 F.3d at 648-49; *Birkelbach v. S.E.C.*, 751 F.3d 472, 475 n.2 (7th Cir. 2014); *cf. Patten Sec. Corp. v. Diamond Greyhound & Genetics, Inc*. (*Patten*), 819 F.2d 400, 402 (3d Cir. 1987), *abrogated on other grounds*.

[18] *See* 72 Fed. Reg. at 42,170.   FINRA's predecessor SRO—*i.e.*, the National Association of Securities Dealers, Inc. (NASD)—gained SEC approval of its revamped arbitration procedures decades ago.  *Grunwald*, 400 F.3d at 1132; *see Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 234 (1987).  NASD exercised this oversight role in conjunction with the regulatory arm of the New York Stock Exchange until July 2007, at which point they merged to form FINRA.  *See* 72 Fed. Reg. at 42,170.

important component of its investor protection mandate" and, since its inception, "has urged the SROs it regulates to provide an alternative dispute resolution forum for customers."[19] In furtherance of that mandate, FINRA now hosts the largest arbitration forum in the United States for resolving such disputes,[20] which, according to FINRA and *amicus*, provides investors with a "fair, efficient and economical alternative to litigation."[21] To ensure that customers can benefit from arbitration, FINRA has promulgated numerous arbitration-related rules,[22] including FINRA Rule 12200, which requires FINRA members to submit customer disputes to FINRA arbitration whenever a customer demands arbitration.[23] Given the compulsory

---

[19] Jill I. Gross, *The Customer's Nonwaivable Right to Choose Arbitration in the Securities Industry*, 10 BROOK. J. CORP. FIN. & COM. L. 383, 394 (2016) (detailing SEC's support for securities arbitration); *see McMahon*, 482 U.S. at 233 (recognizing SEC's "expansive power to ensure the adequacy of arbitration procedures employed" by SROs).

[20] FIN. INDUS. REG. AUTH. (FINRA), *Final Report and Recommendations of the FINRA Dispute Resolution Task Force*, at 1 (Dec. 7, 2015), http://www.finra.org/sites/default /files/Final-DR-task-force-report.pdf.

[21] FINRA, Reg. Notice 16-25, at 1 (July 2016); PIABA Br. at 12.

[22] These rules are set out in the *FINRA Code of Arbitration Procedure for Customer Disputes* (*FINRA Arbitration Code*). *See* FINRA Rules 12000-12905.

[23] FINRA Rule 12200 provides, in relevant part, that a FINRA member "must arbitrate a dispute" with one of its customers if (i) FINRA arbitration is "requested by the customer" or "required by written agreement," and (ii) the

11

nature of the Rule, courts have held that, even in the absence of a written arbitration agreement, Rule 12200 constitutes a binding arbitration agreement between a FINRA member and customer.[24]

A customer can initiate FINRA arbitration and invoke its arbitration rights under Rule 12200 by filing a "statement of claim" with the FINRA Director.[25]   Although Reading

_____

dispute "arises in connection with the business activities of the member."  FINRA Rule 12200; *see* S.E.C., Reg. Notice 08-57 (2008) (approving Rule 12200); *see also Gross*, *supra* note 19, at 396 (noting that brokerages have had a duty to arbitrate upon the demand of a customer since the 1800s).

In July 2016, FINRA issued a regulatory notice, reminding its members "that customers have a right to request arbitration at FINRA's arbitration forum at any time and do not forfeit that right under FINRA rules by signing any agreement with a forum selection provision specifying another dispute resolution process or an arbitration venue other than the FINRA arbitration forum."  FINRA, Reg. Notice 16-25, at 1.

[24] *See, e.g.*, *Golden Empire*, 764 F.3d at 214; *Waterford Inv. Servs., Inc. v. Bosco*, 682 F.3d 348, 353 (4th Cir. 2012).  J.P. Morgan concedes that Reading is a "customer" within the meaning of FINRA Rule 12200.

[25] FINRA Rule 12302(a).  Once initiated, the arbitration is comprehensively governed by the *FINRA Arbitration Code*, which contemplates that the parties will submit to arbitration and comply with the Code.  Indeed, Rule 12212 permits an arbitration panel to "sanction a party for failure to comply with any provision of the Code," and FINRA IM-12200 provides that "[i]t may be deemed conduct inconsistent with

properly invoked its right to arbitrate by filing its statement of claim with FINRA, J.P. Morgan contends that it had no duty to arbitrate because Reading waived its rights under Rule 12200 by agreeing to the forum-selection clauses. It is against this backdrop that we consider the merits of the District Court's order.

## DISCUSSION[26]

In this appeal, we must answer two questions: (i) whether J.P. Morgan, as a FINRA member, is obligated to resolve Reading's substantive claims through FINRA arbitration; and (ii) which court decides that question of arbitrability. To answer those questions we must resolve the inherent tension between Reading's right to arbitrate its claims pursuant to FINRA Rule 12200 and J.P. Morgan's purported contractual right to litigate those same claims pursuant to the forum-selection clauses in the broker-dealer agreements. Complicating this inquiry, the parties do not agree which of these questions must be resolved first; each side argues that the District Court lacked authority to resolve one of the two disputes at issue.

We agree with J.P. Morgan that the transfer dispute, as a threshold question of venue, was properly resolved before the arbitrability dispute. We thus begin by discussing

---

just and equitable principles of trade . . . for a member . . . to: (a) fail to submit a dispute to arbitration under the Code as required by the Code."

[26] The District Court had subject matter jurisdiction under 28 U.S.C. § 1332. We have jurisdiction over this interlocutory appeal under 28 U.S.C. § 1292(b).

whether the District Court was required to transfer Reading's declaratory judgment action to the District Court for the Southern District of New York.

## I.  The District Court Properly Resolved the Transfer Dispute Before the Arbitrability Dispute

When Reading filed its single-count, declaratory judgment action in the District Court, the only merits issue before the court was whether FINRA Rule 12200 required J.P. Morgan to submit to FINRA arbitration.  However, once J.P. Morgan moved to transfer that action, the District Court was presented with a threshold issue regarding the propriety of the venue in which Reading filed its action to compel arbitration—namely, whether the declaratory judgment action should be transferred to New York in light of the forum-selection clauses.  The parties spill much ink on which of these two issues should be resolved first.  In J.P. Morgan's view, the transfer dispute must be resolved first and, since the District Court was required to transfer the action, it lacked authority to resolve the arbitrability dispute.  By contrast, Reading argues that the Federal Arbitration Act (FAA) required the District Court to enforce FINRA Rule 12200 by compelling arbitration and, therefore, the court was divested of its discretion to transfer.  The District Court declined to transfer the case *before* turning to the question of arbitrability.  We agree that threshold disputes over venue and jurisdiction should be resolved before merits disputes.  Thus, we conclude that the District Court's sequence of decision-making was not only permissible, but also preferable.

In *In re: Howmedica Osteonics Corp*, we endorsed the view that district courts have "discretion to address

14

convenience-based venue issues" in the first instance and that they "should suspend concerns about other threshold issues" while doing so.[27] That view is supported by the principle that federal courts have flexibility to choose among alternate "grounds for denying audience to a case on the merits."[28] For instance, the Supreme Court has upheld the authority of a district court to dismiss an action under the doctrine of *forum non conveniens*, without first determining whether the action should be dismissed on jurisdictional grounds.[29] The Court granted such leeway to district courts because a *forum non conveniens* dismissal—much like the parties' dispute over transfer[30]—is a "nonmerits issue" that "does not entail any assumption by the court of substantive law-declaring power."[31] Venue disputes involve only a threshold determination "that the merits should [or should not] be

---

[27] 867 F.3d 390, 404 n.8 (3d Cir. 2017); *see In re LimitNone, LLC*, 551 F.3d 572, 576-78 (7th Cir. 2008).

[28] *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 585 (1999)).

[29] *Id.* at 436; *see Leroy v. Great W. United Corp.*, 443 U.S. 173, 180 (1979) (permitting courts to address venue before personal jurisdiction).

[30] *See Atl. Marine Constr. Co., Inc. v. U.S. Dist. Ct. for the W. Dist. of Texas* (*Alt. Marine*), 571 U.S. 49, 60 (2013) (explaining federal transfer statute "is merely a codification of the doctrine of *forum non conveniens* for the subset of cases in which the transferee forum is within the federal court system").

[31] *Sinochem Int'l Co.*, 549 U.S. at 433 (citation and internal quotation marks omitted).

adjudicated elsewhere."[32]   By contrast, resolving a dispute over arbitrability requires a district court to apply its law-declaring power regarding the parties' right to arbitrate.  This determination may be frustrated if the threshold issue of venue is not decided first.

Moreover, resolving merits disputes at the outset, without first ensuring that venue is proper, would in certain cases nullify the very right afforded by the forum-section clause—*i.e.*, the right to resolve the merits in a contractually designated forum.[33]   In addition, ensuring venue is proper before turning to the merits promotes finality interests and judicial economy by ensuring the facial validity of any subsequent order compelling (or denying) arbitration.[34]   Such concerns are alleviated, however, by resolving threshold challenges to venue before secondary disputes over arbitrability.

The District Court, confronted with a plaintiff seeking to compel arbitration and a defendant moving to transfer the action to compel arbitration based on a forum-selection clause, properly addressed the transfer question before the question of arbitrability.  We will turn then to the propriety of the denial of the motion to transfer.

---

[32] *Id.* at 432.

[33] *See Atl. Marine*, 571 U.S. at 63-64; *see also Puleo v. Chase Bank USA, N.A.*, 605 F.3d 172, 178 (3d Cir. 2010) (en banc).

[34] *See, e.g.*, *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 883 (3d Cir. 1995) (vacating a district court's order denying a motion to compel arbitration after concluding that the court erred by failing to transfer the action to another district).

## II. The District Court Properly Declined to Transfer Reading's Action to Compel Arbitration

### A. *The Supreme Court's decision in* Atlantic Marine *does not require transfer.*

J.P. Morgan moved to transfer Reading's declaratory judgment action, arguing that the Supreme Court's transfer framework announced in *Atlantic Marine* required the District Court to enforce the forum-selection clause by transferring the action to the Southern District of New York. The court disagreed that the forum-selection clause required transfer because, in its view, the clause does "not establish the judicial forum" in which Reading "must compel arbitration."[35] In response to that ruling, J.P. Morgan asked us to determine, on interlocutory review, whether *Atlantic Marine* requires a district court to enforce a forum-selection clause by transferring a declaratory judgment action to compel arbitration, even if the district court concludes that the clause does not encompass the underlying arbitration.[36] In other words, the question instructs us to assume that even if Reading's declaratory judgment action and statement of claim filed with FINRA fall outside the scope of the forum-selection clause, nevertheless *Atlantic Marine* required transfer.

Absent a forum-selection clause, a district court ordinarily assesses whether to transfer a case to another federal district by considering the factors set out in 28 U.S.C. § 1404(a), including "various public-interest considerations"

---

[35] J.A. 3.
[36] J.A. 5, 348, 350; *see supra* note 12 and corresponding text for certified question.

and the private interests of the parties to the litigation.[37]   In *Atlantic Marine*, however, the Supreme Court explained that the presence of a forum-selection clause alters the traditional analysis in several respects.[38]   Most significantly, a court considering a "motion to transfer based on a forum-selection clause should not consider arguments about the parties' private interests," since forum-selection provisions "represent[] the parties' agreement as to the most proper forum."[39]   As a result, when a court is confronted with a valid forum-selection clause that covers the dispute, it must consider only the public-interest factors and "deem the private-interest factors to weigh entirely in favor the preselected forum."[40]   For these reasons, the *Atlantic Marine* Court held that when a party invokes a forum-selection clause to transfer an action under § 1404(a), "a district court should transfer the case unless extraordinary circumstances unrelated to the convenience of the parties clearly disfavor transfer."[41]

Focusing on these words, J.P. Morgan contends that the District Court had to transfer this action because no extraordinary circumstances are present.   But a central

---

[37] 28 U.S.C. § 1404(a) (allowing a district court to transfer a civil action to another district—in which the case could have been brought or to which the parties have consented—"[f]or the convenience of parties and witnesses" and "in the interest of justice"); *see Atl. Marine*, 571 U.S. at 62-63; *Jumara*, 55 F.3d at 879.

[38] *Atl. Marine*, 571 U.S. at 62-63 (internal quotation marks omitted).

[39] *Id.* at 63-64 (internal citation omitted).

[40] *Id.* at 64.

[41] *Id.* at 52.

premise of J.P. Morgan's reliance on *Atlantic Marine*—and the requirement that district courts honor the parties' contractual choice of forum in all but extraordinary circumstances—is that Reading's action to compel arbitration falls within the scope of the forum-selection clauses. Nothing in *Atlantic Marine* disturbs the long-standing body of law clarifying that a court need not transfer an action based on a forum-selection clause if the clause is invalid (*i.e.*, an enforceability challenge) or if it does not cover the action or claims that the defendant is seeking to transfer (*i.e.*, a scope challenge).[42]   Rather, the transfer framework announced in *Atlantic Marine* presupposes the existence of an action that falls within the scope of a valid forum-selection clause.[43]

---

[42] *See, e.g.*, *Collins v. Mary Kay, Inc.*, 874 F.3d 176, 181 (3d Cir. 2017) (explaining that questions regarding the scope of a forum-selection clause are "analytically distinct" from questions regarding that clause's enforceability); *Cottman Transmission Sys., Inc. v. Martino*, 36 F.3d 291, 293 (3d Cir. 1994); *see also John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.* (*John Wyeth*), 119 F.3d 1070, 1075 (3d Cir. 1997).

[43] *Atl. Marine*, 571 U.S. at 62 n.5; *see, e.g.*, *Mary Kay, Inc.*, 874 F.3d at 186 (applying the *forum non convenience* framework only *after* "[h]aving concluded that [the plaintiff's] claim falls within the scope of the . . . enforceable forum selection clauses").   The forum-selection clause at issue in *Atlantic Marine* provided that "all disputes between the parties shall be litigated" in a specific forum. 571 U.S. at 53 (internal quotation marks omitted).  By the time the case reached the Supreme Court, it was undisputed that the litigation between the parties fell within the scope of the forum-selection clauses.  *See* Br. for Resp., *Atl. Marine*, 571 U.S. 49 (No. 12-929), 2013 WL 4495148, at *6 (conceding

19

This conclusion answers the question we certified for interlocutory review:

> [Does] . . . *Atlantic Marine* . . . require[] a district court to enforce a forum selection clause by transferring a declaratory action seeking to compel arbitration, *even if the district court determines that the forum selection clause does not cover the underlying arbitration that the plaintiff seeks to compel*.

The answer is, "No, it does not." If a party invokes a forum-selection clause to transfer an action—here, Reading's action to compel arbitration—but the district court concludes that the action does not fall within the scope of the clause, the traditional § 1404(a) framework applies, not the framework set forth in *Atlantic Marine*.

Accordingly, the District Court was required to apply *Atlantic Marine* and transfer the action to New York *only* if Reading's declaratory judgment action fell within the scope of the forum-selection clause.

---

that the parties' agreement favored transferring the case); Br. for Pet., *Atl. Marine*, 571 U.S. 49 (No. 12-929), 2013 WL 3166391, at *4 (noting that the party resisting transfer "does not dispute that its claims against Atlantic Marine fall within the scope of the mandatory forum selection clause").

### B.    Reading's action to compel arbitration does not fall within the scope of the forum-selection clause.

A scope-based challenge to the applicability of a forum-selection clause presents a quintessential question of contract interpretation.[44]   We have stressed that "whether or not a forum selection clause applies" to a particular dispute "depends on what the specific clause at issue says."[45]   The forum-selection clause in the 2005 and 2007 broker-dealer agreements provides that "all actions and proceedings arising out of this Broker-Dealer Agreement or any of the transactions contemplated hereby shall be brought in the United States District Court in the County of New York."[46] J.P. Morgan maintains that the District Court was required to transfer the case because Reading's petition to compel arbitration is an "action . . . arising out of" the broker-dealer agreements and the related ARS offerings.  Reading counters that the action "arise[s] out of" FINRA Rule 12200—not the broker-dealer agreements or related transactions—and therefore the District Court appropriately denied the motion to transfer.  We agree with Reading.

---

[44] We exercise plenary review over legal questions relating to "[t]he interpretation and enforcement of a forum selection clause," which includes the District Court's order denying J.P. Morgan's motion to transfer.  *Salovaara v. Jackson Nat. Life Ins. Co.*, 246 F.3d 289, 295 (3d Cir. 2001); *Jumara*, 55 F.3d at 880-81.

[45] *John Wyeth*, 119 F.3d at 1075; *Mary Kay, Inc.*, 874 F.3d at 180-81.

[46] J.A. 95, 120.

We begin with the meaning of the phrase "arising out of" in the forum-selection clauses. Because we have admonished that "[d]rawing analogy to other cases is useful only to the extent those other cases address contract language that is the same or substantially similar to that at issue,"[47] we look to the decisions of our sister circuit courts of appeals that have construed the phrase "arising out of" in a forum-selection clause.[48] In *Coregis Insurance Co. v. American Health Foundation, Inc.*, the Second Circuit Court of Appeals defined the phrase in accordance with its ordinary meaning: "To 'arise' out of means 'to originate from a specified source.'"[49] In a subsequent decision, *Phillips v. Audio Active Ltd.*, the Second Circuit rejected the overbroad contention that the phrase arising out of "encompass[es] all claims that have some possible relationship with the contract, including claims that may only 'relate to,' be 'associated with,' or 'arise

---

[47] *John Wyeth*, 119 F.3d at 1075.

[48] Although we have held that state law governs the interpretation of a forum-selection clause in a diversity suit, *see Mary Kay, Inc.*, 874 F.3d at 181-83, the parties have waived any choice-of-law issue by failing to address it in their briefs and by relying on cases that apply different bodies of law than that designated in the broker-dealer agreements' New York choice-of-law clauses. *See Williams v. BASF Catalysts LLC*, 765 F.3d 306, 316-17 (3d Cir. 2014); *see also John Wyeth*, 119 F.3d at 1074.

[49] 241 F.3d 123, 128 (2d Cir. 2001) (quoting *Webster's Third New Int'l Dictionary* 117 (1986)); *see, e.g.*, *United States v. Husmann*, 765 F.3d 169, 173 (3d Cir. 2014) ("We look to dictionary definitions to determine the ordinary meaning of a word.").

in connection with' the contract."[50]  Likewise, the Seventh Circuit Court of Appeals has observed that "courts have resisted the siren call of" equating the term "arising out of" with the concept of but-for causation.[51]  We agree that "arising out of" in a forum-selection clause should be interpreted in accordance with the ordinary meaning of that phrase—*i.e.*, to originate from a specified source. Interpreting a forum-selection clause in accordance with its

---

[50] 494 F.3d 378, 389-91 (2d Cir. 2007) ("[W]e approve of the approach outlined by the Third Circuit, which highlights the language-specific nature of this inquiry and discounts the precedential weight of cases that deal with dissimilarly worded clauses." (citing *John Wyeth*, 119 F.3d at 1075)).  We agree that the phrase "arising out of" is narrower in scope than other clauses we have addressed, such as those encompassing all actions "arising in connection with," "relating to," or "with respect to" an agreement.  *See, e.g.*, *John Wyeth*, 119 F.3d at 1075 (observing that "the phrase 'arising in relation to' is broader than 'arising under'"); *see Carlyle Inv. Mgmt. LLC v. Moonmouth Co. SA*, 779 F.3d 214, 217-20 (3d Cir. 2015) (construing broadly forum-selection clause covering all disputes arising "with respect" to an agreement); *Mary Kay, Inc.*, 874 F.3d at 179 (addressing clause covering any "dispute or controversy [that] arises between [the parties] concerning any matter relating to this Agreement").

[51] *Omron Healthcare, Inc. v. Maclaren Exports Ltd.*, 28 F.3d 600, 602 (7th Cir. 1994) ("[B]ut for the existence of federal drug safety standards, it would not be possible to contend that noncompliance with the standards is tortious, but it does not follow that a tort suit 'arises under' those standards and thus activates federal jurisdiction.").

23

plain meaning comports with well-established principles of interpretation.[52] And, as in *Phillips*, we see "no reason to presume the parties meant anything other than the dictionary definition of the term."[53]

The propriety of transfer thus turns on the following inquiry: Is Reading's declaratory judgment action to compel arbitration—not to be mistaken with the separate action it filed with FINRA—an action or proceeding that *originates from* the broker-dealer agreements or the related ARS offerings? In answering that question, we are again guided by *Phillips*. There, the court held that a plaintiff's federal copyright "claims d[id] not *arise out of*" a recording contract because those claims did not involve an assertion of the plaintiff's "rights or duties under that contract."[54] Instead, the claims arose out of the Copyright Act. Likewise, here, Reading's action to compel FINRA arbitration does not "arise out of" the broker-dealer agreements because Reading's sole claim for declaratory relief does not involve an assertion of Reading's contractual "rights or duties."[55] The only right Reading seeks to enforce in its complaint is its right to arbitrate its claims against J.P. Morgan. That right does not originate from the broker-dealer agreements, but rather from FINRA Rule 12200, which gives Reading the right to demand

---

[52] *See, e.g.*, *Illinois Nat. Ins. Co. v. Wyndham Worldwide Operations, Inc.*, 653 F.3d 225, 231 (3d Cir. 2011); *Great Am. Ins. Co. v. Norwin Sch. Dist.*, 544 F.3d 229, 243 (3d Cir. 2008); RESTATEMENT (SECOND) OF CONTRACTS § 202 (1981).

[53] 494 F.3d at 390.

[54] *Phillips*, 494 F.3d at 390-92.

[55] *See, e.g.*, J.A. 14, ¶ 3; J.A. 15 ¶¶ 5, 10; J.A. 21, ¶¶ 36-40.

24

FINRA arbitration and imposes a corresponding duty on J.P. Morgan to arbitrate.[56] Because the sole source for Reading's right to arbitrate is FINRA Rule 12200—without which Reading would not be entitled to compel arbitration, and J.P. Morgan would not have a duty to arbitrate—Reading's declaratory judgment action does not "arise out of" the broker-dealer agreements.

The broker-dealer agreements come into play *only* because J.P. Morgan has invoked the forum-selection clauses in those agreements as a defense to Reading's declaratory judgment action. "The answer to the question whether a 'defense' based on a contract that contains a forum selection clause implicates that clause depends on the language of the clause."[57] Where, as here, the clause encompasses only disputes "arising out of" the contract, courts have rejected the argument that a contractual defense alone is sufficient to bring the dispute within the scope of the clause.[58] We therefore decline J.P. Morgan's invitation to expand the scope

---

[56] J.P. Morgan urges that Reading's declaratory judgment action falls within the scope of the forum-selection clauses because Reading's complaint explicitly refers to the broker-dealer agreements. But those references alone, which merely contextualize the parties' dispute over arbitrability, do not establish that the petition to compel arbitration "aris[es] out of" those agreements. *See, e.g.*, *Phillips*, 494 F.3d at 390-91.

[57] *John Wyeth*, 119 F.3d at 1076.

[58] *See, e.g.*, *Phillips*, 494 F.3d at 391; *Omron Healthcare, Inc.*, 28 F.3d at 601-02; *Rovi Guides, Inc. v. Comcast Corp.*, 2016 WL 6217201, at *3 (E.D. Tex. Oct. 25, 2016) (citing cases); *see also John Wyeth*, 119 F.3d at 1076 n.5.

of the forum-selection clause, under the guise of interpreting it, to encompass a contractual defense.[59]

Because Reading's declaratory judgment action to compel arbitration is not one "arising out of" the broker-dealer agreements, it does not fall within the scope of the forum-selection clause. We will therefore affirm the District Court's order denying J.P. Morgan's motion to transfer the action to the Southern District of New York.[60]

---

[59] J.P. Morgan argues for the first time in its reply brief that the agreements are not relevant only as a defense "because they create the customer relationship between" the parties and are therefore the "source" of Reading's arbitration demand. Reply. Br. at 6. J.P. Morgan waived this argument, however, by failing to present it in the District Court and by presenting it to this court only in passing. *See, e.g.*, *John Wyeth*, 119 F.3d at 1076 n.6 (citing *Commonwealth of Pa. v. HHS*, 101 F.3d 939, 945 (3d Cir. 1996)). And, in any event, we decline to accept this argument—*i.e.*, the view that but-for the customer relationship created by the agreements Reading would have no right to arbitrate—because it improperly equates the meaning of "arising out of" with the concept of but-for causation. *See Omron Healthcare, Inc.*, 28 F.3d at 602.

[60] We note, however, our disagreement with certain aspects of the District Court's rationale for declining to transfer the action. Instead of examining the language of the forum-selection clauses and asking whether Reading's action fell within their scope, as required by our case law, *John Wyeth*, 119 F.3d at 1075-76, the District Court denied transfer based entirely on our decision in *Patten Securities Corporation v. Diamond Greyhound & Genetics, Inc.*, 819 F.2d 400 (3d Cir.

**III. The District Court Properly Required J.P. Morgan to Submit to FINRA Arbitration Because the Forum-Selection Clause Did Not Waive Reading's Right to Arbitrate Under FINRA Rule 12200**

Having concluded that the Eastern District of Pennsylvania was an appropriate venue in which to resolve the arbitrability dispute, we must decide whether to affirm the court's order requiring J.P. Morgan to submit to FINRA arbitration.[61] This question requires us to reconcile the two competing rights at stake. On the one hand, FINRA Rule 12200 grants Reading the right to resolve its substantive claims against J.P. Morgan through FINRA arbitration.[62] On the other hand, the forum-selection clause grants to J.P. Morgan the contractual right to litigate those claims. Unlike Reading's petition to compel arbitration, the statement of

---

1987). *See* J.A. 3 (Dist. Ct. Op.). But the forum-selection clause at issue in *Patten* is materially different than the clauses at issue here. *Patten*, 819 F.2d at 407 n.3. And, unlike here, *Patten* did not involve any threshold question of transfer, since the petition to enjoin arbitration at issue in *Patten* had been filed in the contractually designated forum.

[61] We review the court's order compelling arbitration *de novo*, as it presents a question of law. *See Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 521 (3d Cir. 2009); *Gay v. CreditInform*, 511 F.3d 369, 376 (3d Cir. 2007).

[62] Numerous courts have held that FINRA Rule 12200 constitutes an enforceable arbitration agreement within the meaning of the FAA. *See, e.g.*, *Golden Empire*, 764 F.3d at 214; *Bosco*, 682 F.3d at 353; *Berthel Fisher & Co. Fin. Servs., Inc. v. Larmon*, 695 F.3d 749, 752 (8th Cir. 2012).

claim Reading filed with FINRA qualifies as an "action [or] proceeding . . . arising out of" the broker-dealer agreements and related ARS transactions.[63]

Attempts to reconcile the tension between a broker-dealer's right to litigate pursuant to a forum-selection clause and a customer's corresponding right to arbitrate under FINRA Rule 12200 have divided our sister circuit courts. The Second and Ninth Circuit Courts of Appeals have held that a materially identical forum-selection clause requires the parties to litigate in federal court,[64] while the Fourth Circuit Court of Appeals has held that Rule 12200 requires the parties to arbitrate, notwithstanding the presence of a forum-selection clause.[65] We agree with the Fourth Circuit that the forum-selection clauses in the broker-dealer agreements are insufficient to waive Reading's right to arbitrate under FINRA Rule 12200.

---

[63] Although several courts have read the phrase "all actions and proceedings" as limited to judicial proceedings, not arbitrations, *see, e.g.*, *UBS Fin. Servs., Inc. v. Carilion Clinic*, 706 F.3d 319, 329-30 (4th Cir. 2013), Reading does not press that argument here. And that narrow interpretation of the terms "actions" and "proceedings" conflicts with the ordinary meaning of those terms. *See Golden Empire*, 764 F.3d at 216.

[64] *Golden Empire*, 764 F.3d at 214-17; *City of Reno*, 747 F.3d at 741-47; *see also Presbyterian Healthcare Servs. v. Goldman, Sachs & Co.*, 122 F. Supp. 3d 1157 (D.N.M. 2015).

[65] *Carilion Clinic*, 706 F.3d at 329-30; *see also COR Clearing, LLC v. Jarvis*, 2014 WL 98799, at *7 (D. Neb. Jan. 9, 2014); *UBS Sec. LLC v. Allina Health Sys.*, 2013 WL 500373, at *4 (D. Minn. Feb. 11, 2013).

On one side of the divide, both the Second Circuit (in *Golden Empire*) and the Ninth Circuit (in *City of Reno*) have held that "a forum selection clause requiring 'all actions and proceedings' to be brought in federal court supersedes an earlier agreement to arbitrate" embodied in FINRA Rule 12200.[66] Treating Rule 12200 as a mere "default obligation" to arbitrate, the Ninth Circuit reasoned (over a dissent) that the customer "clearly and unambiguously disclaimed any right it might otherwise have had to FINRA arbitration" when it assented to the forum-selection clause.[67] The Second Circuit likewise viewed the issue as "whether an arbitration agreement remains in force in light of a later-executed agreement,"[68] concluding that the forum-selection clause in

---

[66] *Golden Empire*, 764 F.3d at 215; *see City of Reno*, 747 F.3d at 747. This rationale presumes that FINRA Rule 12200 imposes a mere contractual duty on J.P. Morgan to arbitrate. Conflating a duty imposed by regulation with one imposed by contract, however, overlooks that FINRA Rule 12200 was adopted pursuant to authority delegated by Congress under the Exchange Act and approved by the SEC. Because FINRA Rule 12200 imposes on broker-dealers a federal regulatory duty to arbitrate and confers on customers a regulatory right to arbitrate, it differs significantly in kind from private contractual arbitration agreements. *See* FINRA, Reg. Notice 16-25, at 5.

[67] *City of Reno*, 747 F.3d at 743. *But see id.* at 748-49 (Battaglia, J., concurring in part, dissenting in part) (rejecting view that the forum-selection clause was sufficiently specific to supersede, displace, or waive the right to arbitrate under FINRA Rule 12200).

[68] Even if Rule 12200 is the functional equivalent of a private contract, this analysis presumes that the "agreement to

that agreement "supersede[d] the background FINRA arbitration rule."[69] These courts accordingly concluded that the forum-selection clauses were controlling and the parties were required to litigate their dispute.

On the other side of the divide, the Fourth Circuit (in *Carilion Clinic*) rejected the contention that the forum-selection clause operated to waive a customer's right to arbitrate under FINRA Rule 12200.[70] The court began with the principle that an agreement waives the right to arbitrate only if it is "sufficiently specific to impute to the contracting parties the reasonable expectation that they are superseding, displacing, or waiving the arbitration obligation created by

---

arbitrate" embodied in FINRA Rule 12200 *predates* the execution of the broker-dealer agreements. That position is hard to reconcile with the fact that an investor's right to demand arbitration under FINRA Rule 12200 stems from its status as a "customer," a status that J.P. Morgan contends is created by the broker-dealer agreements. Reply Br. at 6. J.P. Morgan's position in that regard implies that the agreement to arbitrate under Rule 12200 comes into existence only *after* the parties executed the broker-dealer agreements, not beforehand, which contradicts the notion that the agreements are somehow later-in-time agreements that "superseded" or "displaced" Rule 12200. *See* Gross, *supra* note 19, at 400-401.

[69] *Golden Empire*, 764 F.3d at 216.

[70] *Carilion Clinic*, 706 F.3d at 328-30; *see also City of Reno*, 747 F.3d at 754 (Battaglia, J., dissenting); *UBS Sec. LLC v. Allina Health Sys.*, 2013 WL 500373, at *1 (D. Minn. Feb. 11, 2013).

FINRA Rule 12200."[71]  Although the court acknowledged that "the obligation to arbitrate under FINRA Rule 12200 can be superseded and displaced by a more specific agreement between the parties," it still concluded that the forum-selection clause was not such an agreement, as it was entirely silent on the issue of arbitration.[72]  Thus, the court held that the customer had not waived its right to arbitrate and that the broker-dealer had to submit to FINRA arbitration.[73]

---

[71] *Carilion Clinic*, 706 F.3d at 328-29 (citing cases).  This principle generally aligns with our waiver precedent.  *See Patten*, 819 F.2d at 406-07.

[72] *Carilion Clinic*, 706 F.3d at 328. *But see Golden Empire*, 764 F.3d at 215 (agreeing that the forum selection clause must "specifically preclude[]" arbitration, but disagreeing that the clause must actually mention arbitration to do so).

[73]  In July 2016, FINRA issued a regulatory notice, disagreeing with the reasoning of *Golden Empire* and *City of Reno* and reminding its members "that customers have a right to request arbitration at FINRA's arbitration forum at any time and do not forfeit that right under FINRA rules by signing any agreement with a forum selection provision specifying another dispute resolution process or an arbitration venue other than the FINRA arbitration forum."  FINRA, Reg. Notice 16-25, at 1.  FINRA concluded that "any member firm's denial, limitation or attempt to deny or limit a customer's right to request FINRA arbitration, even if the customer seeks to exercise that right after having agreed to a forum selection clause specifying a venue other than a FINRA arbitration forum, would violate FINRA Rules 2268 and 12200." *Id.*  Nothing in this Opinion precludes FINRA from sanctioning one of its members for attempting to avoid its duty to arbitrate via contract.  *See* FINRA Rule 12212

We agree with the Fourth Circuit that the question is one of waiver, and that the forum-selection clauses did not implicitly waive Reading's right to FINRA arbitration. This conclusion stems in part from our decision in *Patten*, where we had to determine whether a broker-dealer agreement containing a provision in which the parties consented to the jurisdiction of the New Jersey courts implicitly waived the customer's right to arbitration under NASD's compulsory arbitration rule (*i.e.*, the progenitor of Rule 12200).[74] We rejected such an expansive view of waiver by relying on two well-established principles. First, we explained that a "party signing a waiver must know what rights it is waiving."[75] Second, we invoked the strong federal policy, embodied in the FAA, favoring arbitration whenever doubts arise as to whether a dispute is arbitrable.[76] Because the forum-

---

(permitting an arbitration panel to "sanction a party for failure to comply with any provision of the Code"); FINRA IM-12200 (providing that "[i]t may be deemed conduct inconsistent with just and equitable principles of trade and a violation of Rule 2010 for a member . . . to: (a) fail to submit a dispute to arbitration under the Code as required by the Code"); *see also* FINRA, Reg. Notice 16-25, at 5 ("FINRA Rules. . . . are not default rules that may be overridden by more specific or separate contractual terms without consequences under FINRA rules.").

[74] *Patten*, 819 F.2d at 406-07 (characterizing the issue as "whether a forum selection clause is a waiver of NASD arbitration"). NASD is FINRA's predecessor SRO.

[75] *Id.* at 407.

[76] *Id.* (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983)); *see Ehleiter v.*

selection clause in *Patten* was silent as to the issue of arbitration, raising doubts about whether the parties' had waived arbitration and whether the dispute was arbitrable, we held that it was insufficient to waive the customer's right to arbitrate under NASD rules.[77]

Although *Patten* involved a forum-selection clause with permissive language,[78] its reasoning leads us to the same conclusion here:  Reading did not waive its right to arbitrate by agreeing to the broker-dealer agreements.  As in *Patten*, we begin by noting that any reference to arbitration is "[c]onspicuously absent from" the forum-selection clauses.  Without a specific reference to arbitration, the forum-selection clause requiring parties to litigate actions "arising out of" the contract and related transactions lacks the specificity required to advise Reading that it was waiving its affirmative right to arbitrate under FINRA 12200.[79]  Indeed, the Fourth Circuit stressed in *Carilion Clinic* that "[n]o word even suggesting supersedence, waiver, or preclusion [of the

---

*Grapetree Shores, Inc*., 482 F.3d 207, 216 (3d Cir. 2007); *Gay*, 511 F.3d at 394.

[77] *Id.*; *see Personal Sec. & Safety Sys. Inc. v. Motorola Inc.*, 297 F.3d 388, 395 (5th Cir. 2002) (similar).

[78] *Patten*, 819 F.2d at 406-07.  The provision provided that "the Company hereby consents and will submit to the jurisdiction of the courts of the State of New Jersey and of any federal court sitting in the State of New Jersey with respect to controversies arising under this Agreement."  *Id.* at 407 n.3.

[79] *Id.* at 407 ("A party signing a waiver must know what rights it is waiving.").

right to arbitrate] exists" in the forum-selection clause.[80] As we explained in *Patten*, had J.P. Morgan wanted Reading to waive its right to arbitrate, it should "have made a reference to arbitration" in either the waiver provision or forum-selection provisions of the broker-dealer agreements.[81]

Finally, we are reluctant to find an implied waiver here. Reading's right to arbitrate is not contractual in nature, but rather arises out of a binding, regulatory rule that has been adopted by FINRA and approved by the SEC. By condoning an implicit waiver of Reading's regulatory right to arbitrate, we would erode investors' ability to use an efficient and cost-effective means of resolving allegations of misconduct in the brokerage industry and thus undermine FINRA's ability to regulate, oversee, and remedy any such misconduct.[82] In so holding, we split with some of our sister circuits, but begin

---

[80] 706 F.3d at 330.

[81] *See Patten*, 819 F.2d at 406-07.

[82] As FINRA has observed, enforcing purported contractual waivers of the right to arbitrate under FINRA rules would impermissibly permit "FINRA member firms to deny investors the benefits of FINRA's arbitration program, which may, as a practical matter, foreclose customers from asserting their claims, particularly small claims." FINRA, Reg. Notice 16-25, at 4. And as *amicus* explains in its brief, if "brokerage firms are allowed to selectively and unilaterally force certain customers into court, the increased time and cost of going to court will most certainly result in brokerage firms avoiding otherwise meritorious claims." PIABA Br. at 23.

the process of closing this contractual loophole to FINRA's compulsory arbitration rule.[83]

The District Court properly concluded that, under FINRA Rule 12200, J.P. Morgan is required to arbitrate Reading's claims regarding the ARS offerings.[84]

---

[83] Given this conclusion, we need not address whether an explicit waiver of the right to arbitrate would be invalid and unenforceable under Section 29(a) of the Exchange Act, as *amicus* and Reading argue. *See* 15 U.S.C. § 78cc(a) (providing that any contractual "provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, *or of any rule of a self-regulatory organization, shall be void*" (emphasis added)); S. REP. NO. 111-176, at 114 (2010) (amending the Act to ensure "equal treatment for the rules of all SROs under Section 29(a)"); *see also McMahon*, 482 U.S. at 228-30; Gross, *supra* note 19, at 388.

[84] J.P. Morgan also argues that the District Court lacked authority to compel arbitration because Section 4 of the FAA limits the power of district courts "to order arbitration outside of the district," *Econo-Car Intern., Inc. v. Antilles Car Rentals, Inc.*, 499 F.2d 1391, 1394 (3d Cir. 1974); but FINRA has not yet selected the location of the arbitration hearing. J.A. 199. In fact, courts have read those geographical limitations into the FAA in cases "where the arbitration agreement contains a forum selection clause." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lauer*, 49 F.3d 323, 327 (7th Cir. 1995); *see Econo-Car Intern., Inc.*, 499 F.2d at 1394. J.P. Morgan provides no support for the proposition that those limitations apply here where the "arbitration agreement" at issue is a regulatory rule, not a contract containing a forum-

## CONCLUSION

For these reasons, we will affirm the District Court's order, declining to transfer Reading's declaratory judgment action and compelling J.P. Morgan to submit to FINRA arbitration.

---

selection clause. Moreover, we have no reason to believe that the District Court would compel the parties to arbitration outside of the Eastern District of Pennsylvania. FINRA Rule 12213(a)(1) provides that the arbitration hearing generally will be held at "the hearing location closest to the customer's residence at the time of the events giving rise to the dispute"—*i.e.*, FINRA District 9 in Philadelphia, PA. Given the substantial likelihood that the hearing will be held within the Eastern District of Pennsylvania, the District Court did not exceed its authority by issuing an order that merely "directed [the parties] to arbitrate their dispute under the provisions of [*the FINRA Arbitration Code*]." J.A. 4.