**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

WATERFORD INVESTMENT SERVICES,
INCORPORATED,

              *Plaintiff-Appellant,*

          v.

LOUIS BOSCO; ANNETTE BOSCO;
MARY BOROWIAK; MICHAEL
BOROWIAK; RICHARD RUBEL; DIANE
RUBEL; LOUIS AND ANNETTE BOSCO,
Trustees of the Bosco Family
Trust dated 7/31/96; LOUIS AND
ANNETTE BOSCO, Trustees of the
Bosco Family Trust dated 6/25/96;
MARY BOROWIAK, Trustee of the
Mary Borowiak Trust,

              *Defendants-Appellees,*

          and

WAYNE R. CROWLEY; SANDRA A.
CROWLEY; DALE L. RINDLISBACHER;
D-VIII FAMILY LLC; CARRINGTON
SQUARE LLC; FALLS LLC; JERRY S.
WONES; CAROL S. VANETTI,

              *Defendants.*

No. 11-2103

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Robert E. Payne, Senior District Judge.
(3:10-cv-00548-REP-DWD)

Argued: May 16, 2012

Decided: June 21, 2012

Before MOTZ, DAVIS, and WYNN, Circuit Judges.

Affirmed by published opinion. Judge Motz wrote the opinion, in which Judge Davis and Judge Wynn joined.

**COUNSEL**

**ARGUED:** Steven Scott Biss, Charlottesville, Virginia, for Appellant. W. Scott Greco, GRECO & GRECO, PC, McLean, Virginia, for Appellees. **ON BRIEF:** Frederick D. Greco, GRECO & GRECO, PC, McLean, Virginia, for Appellees.

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

Waterford Investment Services, Inc. ("Waterford") appeals the district court's ruling that it must arbitrate certain claims that a group of investors brought before the Financial Industry Regulatory Authority ("FINRA").[1] The investors allege in their FINRA claims that they received bad advice from their financial advisor, George Gilbert. The investors named Gilbert, his current investment firm, Waterford, and his prior firm, Community Bankers Securities, LLC ("CBS"), among others, as parties to the arbitration. In response, Waterford filed this suit asking a federal district court to enjoin the arbi-

---

[1]FINRA was formerly known as the National Association of Securities Dealers, Inc. ("NASD").

tration proceedings and enter a declaratory judgment that Waterford need not arbitrate the investors' claims. The district court, adopting the recommendations of a magistrate judge, concluded that because Gilbert was an "associated person" of Waterford during the events in question, Waterford must arbitrate the investors' claims. For the following reasons, we affirm.

I.

A.

Because the relationship between Gilbert's current firm, Waterford, and his prior firm, CBS, is critical to our holding here, we begin with a discussion of these entities and their relationship.

Waterford, a Florida corporation, is a registered securities broker-dealer with the Securities and Exchange Commission ("SEC") and has been a member of FINRA since March 1999. CBS, a Virginia corporation, is also a registered broker-dealer with the SEC, although it no longer conducts business, and was a member of FINRA from July 1997 through February 2010. In 2005, AIC, Inc., a Virginia corporation, became the majority owner of both CBS and Waterford; by 2009, AIC owned approximately 90 percent of both firms. Through 2009, CBS and Waterford filed separate tax returns and made separate disclosures and filings with FINRA and the SEC.

Although separate corporate entities, CBS and Waterford had in common, in addition to the same majority shareholder, a significant number of directors and officers during the events in question. Nicholas Skaltsounis, for example, was the Chairman of the Board of Directors of Waterford and its Secretary and Treasurer, President and Chief Executive Officer of CBS, and a Director and President of AIC. Roger Leibowitz was the Chief Operating Officer and Executive Vice President of Waterford, a Vice President of CBS, and a Vice President

of AIC. Paula Ann Collier was an Executive Vice President of both Waterford and CBS and, along with Skaltsounis, one of only three Directors of Waterford. Further, CBS and Waterford had in common the same Chief Financial Officer, Franklin Flanary; the same Vice President of Operations, Richard Landi; and another Vice President, Lawrence Barnes.

The two firms did have distinct Chief Compliance Officers. Frank Wainscott served as the President and Chief Compliance Officer of Waterford and worked out of Waterford's principal office in Clearwater, Florida; he had no position with CBS. Similarly, CBS's Chief Compliance Officer, James Mitchell, had no position at Waterford. However, the two firms had an overlapping compliance manager, Cindy Freeland. In his sworn affidavit, Gilbert stated that during his tenure at CBS he "reported exclusively" to Mitchell and Freeland.

Skaltsounis, Leibowitz, Collier, Flanary, Landi, Barnes, Mitchell, and Freeland worked in a shared office suite located in Richmond, Virginia. There was no division of the firms in that office suite, which was home to CBS's main office and housed the majority of Waterford's employees. The two firms also had six common employees working in compliance, operations, sales, and accounting.

Within the shared office space, CBS and Waterford used the same trading desk and shared various resources, for which CBS paid, including Internet, phone service, postage, cable, office supplies, and office casualty insurance, among others. CBS also paid the rent for the office suite up until August 2009, at which time the rent was abated by lease. After CBS ceased operations in December 2009, Waterford took over the payments for the office supplies and the rent. At all relevant times, the lease was in the name of both firms' majority owner, AIC.

## B.

Beginning in 2005, Louis and Annette Bosco and various members of their family (collectively "Investors") invested large sums of money, assertedly their "life savings," through Gilbert, their financial advisor. The Investors allege that the two largest investments they made through Gilbert turned out to be fraudulent Ponzi schemes.[2] As a result, by 2009, the Investors had lost over one million dollars in these two securities.

During this time period, Gilbert sold securities exclusively through CBS under an Independent Associate Agreement "to sell . . . any and all securities approved for sale" by CBS. Beginning in September 2009, CBS learned of various FINRA arbitration claims that customers had filed against the firm, at least some of which involved the same securities at issue in the Investors' claim. Shortly thereafter, in December 2009, CBS ceased operations.

On December 23, 2009, Landi, the Vice President of Operations at both CBS and Waterford, contacted Gilbert by phone to inform him that CBS was shutting its doors. During the same call, Landi offered Gilbert a position with Waterford. The following day, Gilbert sent emails to two of the Investors informing them that CBS was "combining with their [sic] sister company and using the name of the sister company, Waterford Investment Services," and asking them to sign an attached account transfer form to change their accounts to Waterford. Although Gilbert acknowledges sending the emails, he now asserts that it was his own "personal belief" that CBS and Waterford were "combining" and that he was "wrong."

---

[2]In 2009, the SEC filed complaints in federal court against both companies alleging they violated federal securities laws by committing fraud.

Waterford made transfer offers to approximately 30 of CBS's associates based, in part, on their revenue production. Approximately 25 of those associates accepted the offers and transferred to Waterford, as did seven CBS staff members. Of CBS's 1,700 customer accounts, 995 of them also transferred to Waterford. Although several of the Investors transferred their accounts to Waterford at that time, they have since closed those accounts.

On December 30, 2009, Freeland, as a representative of CBS and on CBS letterhead, officially informed Gilbert of his termination from CBS. Six days later, on January 5, 2010, Freeland, as a representative of Waterford and on Waterford letterhead, officially welcomed Gilbert to Waterford.

In April 2010, Waterford learned that the Investors had filed a FINRA arbitration claim against the firm. The Investors also named Gilbert, CBS, AIC, Skaltsounis, and Mitchell in their statement of claim. The Investors contend that Gilbert and the others failed to perform "proper due diligence" of the alleged Ponzi scheme securities, that they made various misrepresentations and omissions with respect to these securities and failed "to disclose the risks involved," and that they recommended "unsuitable investments" for the Investors' particular needs.

On August 4, 2010, Waterford filed this action seeking a declaratory judgment that it was "not obligated to arbitrate any claim with [the Investors], and injunctive relief to enjoin certain arbitration proceedings commenced by [the Investors] in which [they] have or seek to name Waterford as a party." The parties filed cross motions for summary judgment and stipulated to the material facts. Magistrate Judge Dennis W. Dohnal, in an exceedingly thorough report and recommendation, concluded that Gilbert was an "associated person" of Waterford during the events in question and, thus, pursuant to FINRA rules, Waterford had to arbitrate the Investors' claims. Magistrate Judge Dohnal also concluded that, under Virginia

law, Waterford was a mere continuation of CBS and thus was a successor-in-interest to CBS's agreement to arbitrate its customers' claims. Over Waterford's objections, the district court adopted the magistrate judge's report and recommendation in its entirety and granted the Investors' motion for summary judgment, concluding the Investors' dispute was arbitrable.[3] Waterford timely filed this appeal.

## II.

We review de novo the district court's determination that a dispute is arbitrable. *Wash. Square Secs., Inc. v. Aune*, 385 F.3d 432, 435 (4th Cir. 2004).

## A.

The Supreme Court has held that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (quoting *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960)). When the parties have agreed to an arbitration clause, however, courts apply "a presumption of arbitrability," such that "an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Aune*, 385 F.3d at 436 (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986)).

The Investors point to the FINRA Code of Arbitration Procedure for Customer Disputes ("FINRA Code"),[4] which gov-

---

[3]Because the district court adopted the magistrate judge's report and recommendation in its entirety "on the basis of the [its] reasoning," we hereafter refer to the report and recommendation as the opinion of the district court.

[4]The Code is available online at http://finra.org/arbitrationand mediation/arbitration/rules/codeofarbitrationprocedure/.

erns arbitration of disputes involving FINRA members and customers, as the source of Waterford's agreement to arbitrate the present dispute. The FINRA Code provides that a customer can compel arbitration of a dispute "between a customer and a member or associated person of a member" when the dispute "arises in connection with the business activities of the member or the associated person." FINRA Rule 12200. This provision "constitutes an 'agreement in writing' under the Federal Arbitration Act, 9 U.S.C. § 2, which binds . . . [a FINRA] member, to submit an eligible dispute to arbitration upon a customer's demand." *Aune*, 385 F.3d at 435. Accordingly, a court applies "the federal policy favoring arbitration" when interpreting this provision, "generously constru[ing] [the parties' intentions] as to issues of arbitrability" and "[resolving] any ambiguities as to the scope of the arbitration clause" in favor of arbitration. *Id.* at 435-36 (internal quotation marks omitted).[5]

The parties agree that the Investors are "customers" of Gilbert and that their claims arise out of Gilbert's "business activities." In *Aune*, 385 F.3d at 436-37, we determined that a member must arbitrate the claims of its associated person's customers. The only issue in dispute, therefore, is whether Gilbert was an "associated person" of Waterford during the events in question such that the Investors—Gilbert's customers—can compel Waterford to arbitrate the dispute.

FINRA Rule 12100(r) defines a "person associated with a member," *inter alia*, as "a natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a member." The Investors contend, and the district court found, that Waterford "in-

---

[5]In *Aune*, we interpreted NASD Rule 10301, the predecessor to FINRA Rule 12200. The two rules are substantively equivalent; thus our analysis in *Aune* of NASD Rule 10301 applies equally to FINRA Rule 12200. *Accord In re Am. Express Fin. Advisors Secs. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011).

directly" controlled Gilbert during the events in question. Waterford argues that it never exercised any sort of control over Gilbert before he signed his associate agreement with the firm in 2010 and, thus, he was not an associated person of Waterford prior to that time.

Whether a person who is not in a contractual relationship with a member firm nevertheless can be an "associated person" of that firm for purposes of FINRA arbitration seems to be a novel question. *Aune* involved a representative who did have a contractual relationship with the member firm; however, we find guidance in the broad approach taken in *Aune*. Resolving all ambiguities in favor of the presumption favoring arbitration, we held in *Aune* that the member firm had to arbitrate the claims of the representative's customers even though the member had no relationship with the customers and had neither authorized nor had any knowledge of the representative's sale of the allegedly fraudulent securities. *Aune*, 385 F.3d at 436-37. We apply the same presumption in this case and, thus, "must construe [Rule 12200] in favor of arbitration" if it is "susceptible to a meaning which covers the Investors' dispute." *Id.* at 437. That means that in this case, we ask whether Rule 12200 is "susceptible to a meaning" that Gilbert was an "associated person" of Waterford during the events in question, i.e., whether Waterford "indirectly controlled" Gilbert.

In making this determination, we look to analysis of what constitutes a "control" person under another federal statute governing sellers of securities, § 20(a) of the Securities and Exchange Act. Section 20(a) makes every person "who, directly or indirectly, controls any person" jointly and severally liable for violations of that Act. 15 U.S.C. § 78t(a). In determining "whether a defendant possessed the requisite control," in that context, a court gives "'heavy consideration to the power or potential power to influence and control the activities of a person, as opposed to the actual exercise thereof.'" *In re Mut. Funds Inv. Litig.*, 566 F.3d 111, 130 (4th

Cir. 2009) (quoting *Rochez Bros., Inc. v. Rhoades*, 527 F.2d 880, 890–91 (3d Cir. 1975)), *rev'd on other grounds*, *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011); *see also* 17 C.F.R. § 230.405 (defining "control" in the governing regulations as the "possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person").

The district court adopted a similar definition in this case, concluding that indirect control under the FINRA Code required "the power and ability to exercise power" but not "that the power actually be exercised." *Waterford Inv. Servs., Inc. v. Bosco*, 2011 WL 3820723, at \*13 (E.D. Va. July 29, 2011). Waterford has not challenged this definition. Applying the federal presumption in favor of arbitration, we agree that to have indirect control of a person, such that he is an "associated person" under FINRA Rule 12200, a member firm need only have the potential power to influence the person, rather than exercise any actual control over him.

Accordingly, we turn to the question of whether Waterford had the potential power to control Gilbert.

B.

The district court held that Waterford did have such power over Gilbert. The court relied heavily on the "significant degree of overlap in personnel and resource utilization" between CBS and Waterford at the time of the events in question, including that "[a] number of officers and employees of CBS in 2009 were also officers and employees of Waterford at the same time in 2009." *Id.* at \*14. The court highlighted Skaltsounis's and Leibowitz's high-level positions at CBS, Waterford, and AIC. Moreover, the court noted that the firms shared office space in Richmond, Virginia, with "no division between the offices of the different firms," and also shared a trading desk within the suite. *Id.* at \*15. This high degree of overlap in personnel and resources, the court held, "would

have given rise to myriad opportunities for Waterford's officers, directors, and managers to at least indirectly control Gilbert, thus making him an associated person of Waterford for purposes of FINRA Rule 12200." *Id.* at *14.

On appeal, Waterford does not deny the degree of overlap between the two firms in regard to the common officers and employees or the shared resources. Instead, Waterford contends that the "unique and integral role" of the different Chief Compliance Officers in the two firms rendered Waterford without power to influence Gilbert, when he worked for CBS. Appellant's Br. at 16. Mitchell served as Chief Compliance Officer at CBS; Wainscott carried out this role for Waterford. Neither Mitchell nor Wainscott was affiliated with the other's firm. But Waterford's focus on the separate role of one position in the two firms, no matter how persistent that focus, simply does not eliminate the overlapping roles and actions of numerous other high-level officers and directors with powerful positions in both firms.

Further, Waterford offers no compelling rationale why we should place such emphasis on the role of the compliance officer. The definition of "associated person" is broad, allowing for a representative, like Gilbert, to be an associated person of a member firm whenever he is "directly or indirectly . . . controlled by a member." *See* FINRA Rule 12100(r). The definition's own terms do not limit a member's control of an associated person to issues of FINRA compliance. Moreover, Gilbert's Independent Associate Agreement with CBS provided for Gilbert's various duties and obligations, including those related to compliance standards, but also requiring, for example, that Gilbert use his "best efforts to sell or cause to be sold any and all securities approved for sale by [CBS]." There simply is no reasonable inference to be made that CBS's Chief Compliance Officer, who happened to be unaffiliated with Waterford, was the only CBS employee who could exercise control over Gilbert's activities.

To the contrary, the significant degree of overlap between the two firms in terms of their majority owner, officers and directors, and shared resources, establishes that various players at *Waterford* had the potential power to control Gilbert as well. Indeed, substantial undisputed record evidence indicates that these overlapping officers and directors took actions that affected both companies, and their representatives, simultaneously. For example, when CBS ceased its operations in 2009, both Skaltsounis and Landi were involved in deciding which CBS representatives should receive offers to transfer to Waterford. Landi, who was being paid by CBS, made Gilbert and the other high-earning representatives their offers to transfer to Waterford. And Leibowitz, who along with Wainscott was responsible for Waterford's day-to-day operations in 2009, received his salary from CBS that year.

Moreover, even if we were to confine our analysis to whether Waterford could have exercised some power over Gilbert's compliance with the FINRA Rules, we would arrive at the same conclusion. First, Waterford does not dispute that Mitchell (CBS's Chief Compliance Officer) was subordinate to Skaltsounis, who was President and CEO of CBS *and* the Chairman of the Board and an officer of Waterford. Second, both firms shared the same majority shareholder, AIC, of which Skaltsounis was a director and President. Third, Collier, another of the three directors of Waterford, was also Executive Vice President of CBS. Thus, as the district court concluded, "the controlling members of Waterford were vested with indirect control of Gilbert through Mitchell." *Waterford Inv. Servs.*, 2011 WL 3820723, at \*15.

Additionally, the firms had an overlapping compliance manager, Freeland. The district court concluded that this dual role gave Freeland's "superiors at Waterford ample opportunity to indirectly control Gilbert through Freeland." *Id.* Waterford attempts to downplay Freeland's role by challenging the court's conclusion that she was one of Gilbert's "immediate supervisors." Appellant's Br. at 21. However, Gilbert himself

acknowledged that he reported directly to just two persons: Freeland and Mitchell. The mere fact that Mitchell was an officer and Freeland a manager does not establish, as Waterford suggested at oral argument, that Freeland had no authority or ability to influence Gilbert. Rather, the record contains considerable uncontroverted contrary evidence. Namely, Freeland made compliance requests of Gilbert that he dutifully fulfilled. And it was Freeland, as a representative of CBS, who officially informed Gilbert of his termination from CBS, and, as a representative of Waterford, officially welcomed Gilbert to Waterford less than a week later.

In light of the undisputed evidence of the extensive overlap in owners, directors, officers, and employees of Waterford and CBS and their shared office space and other resources, and given the federal presumption in favor of arbitration, we agree with the district court that Waterford had the power to influence Gilbert and, thus, "indirectly controlled" him. Accordingly, we hold that FINRA Rule 12200 is "susceptible to a meaning" that Gilbert was an "associated person" of Waterford, and, consequently, that the arbitration clause in Rule 12200 "covers the Investors' dispute." *Aune*, 385 F.3d at 437. In short, the Investors can compel Waterford to arbitrate their claims.[6]

### III.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.

---

[6]Given our holding that, because Gilbert was an "associated person" of Waterford, the Investors were entitled to arbitrate their claims against Waterford, we need not consider the district court's alternative holding that arbitration was appropriate because Waterford was a "mere continuation" of CBS. *See Waterford Inv. Servs.*, 2011 WL 3820723, at *17.