**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| OPPENHEIMER & CO. INC., | No. 24-2379 |
| *Plaintiff - Appellee,* | D.C. No. 2:23-cv-00067-MJP |
| v. | |
| STEVEN MITCHELL; DORI MITCHELL; JEROME HOPPER; LORI HOPPER, | OPINION |
| *Defendants - Appellants.* | |

Appeal from the United States District Court
for the Western District of Washington
Marsha J. Pechman, District Judge, Presiding

Argued and Submitted April 1, 2025
Pasadena, California

Filed April 24, 2025

Before: MILAN D. SMITH, JR. and LAWRENCE
VANDYKE, Circuit Judges, and JANE MAGNUS-
STINSON, District Judge.[*]

Opinion by Judge Milan D. Smith, Jr.

---

[*] The Honorable Jane Magnus-Stinson, United States District Judge for
the Southern District of Indiana, sitting by designation.

# SUMMARY[**]

## Arbitration

The panel affirmed the district court's order granting summary judgment in favor of Oppenheimer & Co., Inc., which sought a declaration that the Defendants, the alleged victims of a Ponzi scheme, were not its customers and therefore not entitled to arbitration; and entering a permanent injunction prohibiting Defendants from arbitrating their claims.

In November 2021, Defendants commenced an arbitration proceeding against Oppenheimer in the dispute resolution arbitral forum of the Financial Industry Regulatory Authority (FINRA). Before a final evidentiary hearing was scheduled to begin before a panel of arbitrators, Oppenheimer filed the present action against Defendants.

Although Defendants conceded that they had no direct relationship with Oppenheimer, a FINRA member, they alleged that they were customers of Oppenheimer for purposes of FINRA Rule 12200 because they transacted with Oppenheimer employee John Woods, who was one of Oppenheimer's "associated persons" within the meaning of the FINRA Code.

The panel held that a "customer" under FINRA Rule 12200 includes any non-broker and non-dealer who purchases commodities or services from a FINRA member or its associated person. The panel found that Defendants

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

could be entitled to arbitrate their claims against Oppenheimer if they could demonstrate that they transacted with Woods. Nevertheless, the panel agreed with the district court that Defendants did not transact with Woods because they purchased their investments from Woods's associate, Michael Mooney, and not from Woods himself. The panel further rejected Defendants' claim that their investments, through Mooney, and into an entity formed and controlled by Woods, may be attributed to Woods under an "alter ego" theory of liability.

The panel held that the district court did not abuse its discretion by entering a permanent injunction. The panel rejected Defendants' contentions that the district court erred by introducing unsupported requirements for the legal definition of a "customer" and by making factual findings that were unsupported by the record.

## COUNSEL

Jason D. Frank (argued) and Matthew C. McDonough, Morgan Lewis & Bockius LLP, Boston, Massachusetts; Andrew DeCarlow, Morgan Lewis & Bockius LLP, Seattle, Washington; for Plaintiff-Appellee.

Roger M. Townsend (argued), Breskin Johnson & Townsend PLLC, Seattle, Washington; Craig Kuglar, Law Firm of Craig H. Kuglar LLC, Atlanta, Georgia; for Defendants-Appellants.

Alan L. Rosca, Rosca Scarlato LLC, Beachwood, Ohio, for Amicus Curiae Public Investors Arbitration Bar Association.

Robert J. Giuffra Jr. and Jason P. Barnes, Sullivan & Cromwell LLP, New York, New York; Morgan L. Ratner, Sullivan & Cromwell LLP, Washington, D.C.; for Amicus Curiae The Securities Industry and Financial Markets Association.

---

# OPINION

M. SMITH, Circuit Judge:

Defendants, the alleged victims of a Ponzi scheme perpetrated by John Woods, seek to bring supervisory liability claims against Woods's employer, Plaintiff Oppenheimer & Co. Inc. Because FINRA Rule 12200 obligates FINRA members to arbitrate the claims of customers upon request, Defendants brought their claims against Oppenheimer, a FINRA member, in one of FINRA's arbitral forums. Oppenheimer responded by commencing these proceedings in federal court, seeking a declaration that Defendants were not its customers and therefore not entitled to arbitration. The district court agreed. After a limited period of discovery, it granted summary judgment in favor of Oppenheimer and entered a permanent injunction prohibiting Defendants from arbitrating their claims.

Defendants timely appeal that outcome. Although they concede that they have no direct relationship with Oppenheimer, they maintain—as they did in the district court—that they are customers of Oppenheimer for purposes of FINRA Rule 12200 because they transacted with Woods, who is one of Oppenheimer's "associated persons" within the meaning of the FINRA Code. Defendants accordingly

ask that we vacate the district court's injunction and authorize them to proceed in arbitrating their claims. Defendants further argue that, even if they are not customers of Oppenheimer, the district court abused its discretion by entering a permanent injunction and committed reversible legal errors in its analysis.

We disagree. We conclude, as did the district court, that individuals who transact with "associated persons" of FINRA members are "customers" of those FINRA members for purposes of FINRA Rule 12200. Therefore, we find that Defendants could be entitled to arbitrate their claims against Oppenheimer if they could demonstrate that they transacted with Woods. Nevertheless, we agree with the district court that Defendants did not transact with Woods because they purchased their investments from Woods's associate, Michael Mooney, and not from Woods himself. We further reject Defendants' claim that their investments, through Mooney, and into an entity formed and controlled by Woods, may be attributed to Woods under an "alter ego" theory of liability. Because we discern no other errors in the district court's analysis, we affirm its order in full.

## FACTUAL BACKGROUND

Plaintiff-Appellee Oppenheimer & Co. Inc. (Oppenheimer) is a securities firm headquartered in New York, with approximately 90 branch offices across the United States. Oppenheimer is a member of the Financial Industry Regulatory Authority (FINRA) and is registered with the Securities and Exchange Commission (SEC) as both a broker-dealer and an investment advisor. Through its registered investment adviser representatives, including John Woods (Woods), an employee in Oppenheimer's

Atlanta, Georgia branch, Oppenheimer offers a variety of investment products for sale.

Defendants-Appellants Steven and Dori Mitchell (the Mitchells) and Jerome and Lori Hopper (the Hoppers) are retired pilots and their spouses who invested in an alleged Ponzi scheme perpetrated by Woods. According to Defendants, while Woods was employed by Oppenheimer between 2003 and 2016, he controlled two companies—Horizon Private Equity, III, LLC (Horizon), a private equity fund, and Livingston Group Asset Management Company, Inc. d/b/a Southport Capital (Southport), an investment advisor—that collaborated to prey upon elderly victims. Specifically, under the direction of Woods, Southport allegedly entreated individuals to invest in Horizon based upon material misrepresentations that their investments were safe and secure, would pay a fixed rate of return, and could be returned without penalty subject to limited waiting periods. According to Defendants, these guarantees—and their investments—proved to be worthless, while Horizon was a shell entity that made no returns and instead operated only by paying out funds derived from new investor capital.

Working with Michael Mooney (Mooney), one of Southport's registered representatives, the Hoppers invested approximately $600,000 of their retirement savings into Horizon beginning in May 2016. The Mitchells, also working with Mooney, invested over $1,600,000 beginning in July 2016. Defendants' investments, and their interactions with Southport, were facilitated primarily by Mooney, who sold Defendants their securities, served as their ongoing investment adviser, and earned commissions on their business. In investing in Horizon, Defendants had no contact or relationship with any representative of Oppenheimer. Apart from a single phone conversation

between the Mitchells and Woods in 2016, Defendants also had no direct contact or relationship with Woods.

## PROCEDURAL BACKGROUND

In November 2021, Defendants, along with one other claimant, commenced an arbitration proceeding against Oppenheimer in FINRA's dispute resolution arbitral forum. The proceeding, which was styled as *Mitchell v. Oppenheimer & Co. Inc.*, FINRA No. 21-02818 (the FINRA Arbitration), arose from Defendants' claims that Woods was perpetrating a Ponzi scheme that preyed upon elderly victims. Through their arbitration statement of claim, Defendants alleged that Woods, Southport, Horizon, and Mooney had collectively induced them to invest millions in Horizon based upon material misrepresentations that investing was profitable and low-risk. Defendants further alleged that Oppenheimer, as Woods's employer, failed to carry out its legal duty to supervise Woods and his business activities.

The FINRA Arbitration proceeded through discovery, and a panel of three FINRA arbitrators was selected to oversee the arbitration in accordance with the FINRA Code. A final evidentiary hearing was scheduled to begin before the panel of arbitrators in March 2023. Before that hearing occurred, Oppenheimer filed the present action against Defendants in January 2023. Through the action, to which Woods is not a party, Oppenheimer sought a declaratory judgment that it was not required to arbitrate with Defendants because they were not its customers for purposes of FINRA Rule 12200. Oppenheimer further sought a permanent injunction prohibiting Defendants from arbitrating their claims.

In March 2023, the district court granted Oppenheimer's motion for a preliminary injunction. Limited discovery then proceeded, followed by briefing on the parties' cross-motions for summary judgment. During this time, Defendants voluntarily moved to dismiss without prejudice their claims in the FINRA Arbitration. The arbitration panel granted Defendants' motion and held that if Defendants prevailed in federal court, they could "separately or jointly refile their claims in arbitration proceeding(s) at a later date."

In April 2024, the district court granted Oppenheimer's motion for summary judgment and denied Defendants' cross-motion for summary judgment. It held that Defendants were not customers of Woods or Oppenheimer, and therefore not entitled to arbitrate their claims under FINRA Rule 12200, because they did not purchase their interests in Horizon through or from Woods or Oppenheimer. It further held that Oppenheimer had satisfied the requirements for a permanent injunction because Oppenheimer would be irreparably harmed by proceeding to arbitration, the equities favored Oppenheimer's cause, and there was no public interest in compelling Oppenheimer to arbitrate against its wishes. The district court then entered a permanent injunction prohibiting Defendants from arbitrating their claims. Defendants timely appealed.

## STATUTORY BACKGROUND

FINRA, formerly the National Association of Securities Dealers, Inc. (NASD), is a not-for-profit corporation registered with the SEC as a national securities association under the Maloney Act. 15 U.S.C. § 78*o*–3. "FINRA is a self-regulatory organization that has 'the authority to exercise comprehensive oversight over "all securities firms that do business with the public."'" *Goldman, Sachs & Co.*

*v. City of Reno*, 747 F.3d 733, 737 (9th Cir. 2014) (quoting *UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc.*, 660 F.3d 643, 648 (2d Cir. 2011)).   To ensure this oversight, all securities firms seeking to conduct transactions with the investing public in the United States are required to register as FINRA members.   15 U.S.C. § 78*o*(b)(8); 17 C.F.R. § 240.15b9-1.   Members agree to abide by FINRA's set of rules and regulations, known as the FINRA Code.   FINRA Bylaws, art. IV, § 1(a).

One of the rules by which FINRA members agree to abide is FINRA Rule 12200, which provides that "[p]arties must arbitrate a dispute under the [FINRA] Code" if three conditions are satisfied.   FINRA Rule 12200.   First, arbitration must be "either (1) [r]equired by a written agreement, or (2) [r]equested by the customer." *Id.*   Second, the dispute must be "between a customer and a member or associated person of a member." *Id.*   Third, and finally, the dispute must "arise[] in connection with the business activities of the member or the associated person." *Id.*   If these three conditions are present, a de facto "agreement" is created that permits customers to submit claims to FINRA's arbitral forums. *Reno*, 747 F.3d at 739 n.1.   Pursuant to the Federal Arbitration Act (FAA), such agreements to arbitrate are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."   9 U.S.C. § 2; *see also Reno*, 747 F.3d at 739.[1]

---

[1] The NASDA Code of Arbitration, which was the predecessor to the FINRA Code, included NASDA Rule 10301, a rule regarding arbitration that is analogous to FINRA Rule 12200.   FINRA has clarified that, despite surface-level amendments to the language of the two rules, there is no substantive difference between them. *See Comparison Chart of*

FINRA's arbitral forums offer a relatively efficient and low-cost pathway for conflict resolution. According to the amicus brief of the Securities Industry and Financial Markets Association (SIFMA), FINRA arbitration "incorporates substantive and procedural protections comparable to court-based litigation, and thereby ensures fair case outcomes for retail customers." Kevin Carroll, *Securities Arbitration Works Effectively and Benefits Investors*, Sec. Indus. & Fin. Mkts. Ass'n (Oct. 5, 2021), https://www.sifma.org/resources/news/blog/securities-arbitration-system-works-effectively-and-benefits-investors [hereinafter SIFMA Arbitration Article]. Further, FINRA arbitration provides for "faster resolution of disputes" than court-based litigation and "reduces legal costs." Kevin M. Carroll et al., *White Paper on Arbitration in the Securities Industry* 50 (2007), https://www.sifma.org/wp-content/uploads/2017/05/sifma-sifmacl-white-paper-on-arbitration-in-the-securities-industry.pdf. According to SIFMA, these qualities make FINRA arbitration "less expensive, more expedient, and just as fair as court-based litigation." SIFMA Arbitration Article at 4.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction to review the district court's summary judgment ruling pursuant to 28 U.S.C. § 1291.

---

*Old and New NASD Arbitration Codes for Industry Disputes*, Fin. Indus. Regul. Auth., www.finra.org/sites/default/files/RuleFiling/p018369.pdf (last visited April 16, 2025). For that reason, we follow other courts in concluding that "[t]he cases interpreting and applying [NASDA] Rule 10301 apply with equal force to [FINRA] Rule 12200." *Berthel Fisher & Co. Fin. Servs., Inc. v. Larmon*, 695 F.3d 749, 752 n.3 (8th Cir. 2012) (quoting *Herbert J. Sims & Co. v. Roven*, 548 F. Supp. 2d 759, 763 n.2 (N.D. Cal. 2008)); *Waterford Inv. Servs., Inc. v. Bosco*, 682 F.3d 348, 353 n.5 (4th Cir. 2012).

*Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 429–30 (1985). "We review de novo a district court's grant or denial of summary judgment." *Botosan v. Paul McNally Realty*, 216 F.3d 827, 830 (9th Cir. 2000). We review for abuse of discretion a district court's decision to grant or deny permanent injunctive relief. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006); *L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 654 (9th Cir. 2011).

## ANALYSIS

The central issue raised by this appeal is whether Defendants may arbitrate their claims against Oppenheimer. On the one hand, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (quoting *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960)). On the other hand, as noted, FINRA Rule 12200 obligates FINRA members like Oppenheimer to submit any "dispute under the [FINRA] Code" to arbitration when requested by "customer[s]." Defendants have plainly requested arbitration, and it is undisputed that their claims, which concern Oppenheimer's supervisory obligations under FINRA, fall within the ambit of a "dispute under the [FINRA] Code." Therefore, whether Defendants may force Oppenheimer into one of FINRA's arbitral forums turns solely on the question whether Defendants are "customers" of Oppenheimer for purposes of Rule 12200.

Defendants, who concede that they have no direct relationship with Oppenheimer, submit only one theory through which they might be its customers: They argue that they have engaged in transactions with Woods, who acts as an "associated person" of Oppenheimer for purposes of the

FINRA Code.  The validity of this theory, which the district court rejected, occupies the bulk of our analysis here. Defendants also raise two additional challenges to the district court's ruling.  First, they argue that, even if they are not "customers" of Oppenheimer, the district court abused its discretion by granting a permanent injunction.  Second, they argue that the district court committed legal error by imposing unsupported legal requirements and making erroneous factual findings.

We evaluate these arguments in turn.  Because we conclude that they are without merit, we affirm in full the decision below.

## I.   Defendants Are Not "Customers" of Oppenheimer.

The first, and primary, question raised by this appeal is whether Defendants are customers of Oppenheimer for purposes of FINRA Rule 12200.  Defendants concede that they are not direct customers because they have not transacted with Oppenheimer.  Defendants nevertheless submit that they are indirect customers of Oppenheimer because they are customers of Woods, one of Oppenheimer's associated persons.  The viability of this theory turns on two issues: whether FINRA Rule 12200 applies to customers of associated persons, and whether Defendants are actually customers of Woods.

### a.   An Investor Who Purchases Commodities or Services from an "Associated Person" of a FINRA Member Is a "Customer" of the Member for Purposes of FINRA Rule 12200.

As noted, a FINRA member must arbitrate a dispute if: (1) "[r]equested by the customer"; (2) "[t]he dispute is between a customer and a member or associated person of a

member"; and (3) "[t]he dispute arises in connection with the business activities of the member or the associated person." FINRA Rule 12200. This rule plainly provides the customer of a FINRA member with the right to request and receive arbitration. *Reno*, 747 F.3d at 739. Yet "ambiguity results from the fact that the rule does not specify with whom the customer must conduct business. That is, as written, the rule leaves open the possibility that a dispute could arise between 'a [member's] customer and a member' *or* between '[an associated person's] customer and a member.'" *Washington Square Sec., Inc. v. Aune*, 385 F.3d 432, 436 (4th Cir. 2004) (alteration in original); *see also John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48, 59 (2d Cir. 2001). The FINRA Code offers little insight into this ambiguity. Its separate rule providing "definitions" of terms used throughout the Code defines "customer" only in the negative: "A customer shall not include a broker or dealer." FINRA Rule 12100(k).

This ambiguity has important ramifications for the group of "customers" who are entitled to FINRA arbitration. Only the large companies that register for FINRA membership are FINRA members. By contrast, an "associated person" of a FINRA member includes "any employee of the [member], except any person whose functions are solely clerical or ministerial." FINRA Rule 1011(b). To qualify as a "customer" for purposes of Rule 12200, must an individual transact directly with the FINRA member—the entity—itself? Or may an individual merely transact with one of the FINRA member's many non-clerical, non-ministerial employees—finance professionals, investment advisers, and anyone else in the member's substantive employ? This question not only affects which customers may arbitrate but which claims they may bring to the fore. As Defendants'

case illustrates, "[i]t is possible that an 'associated person' of a FINRA member could have an independent company." *Centaurus Fin., Inc. v. Ausloos*, No. 19-CV-243, 2019 WL 2027271, at \*5 (E.D. Wis. May 8, 2019). Does Rule 12200 entitle a customer to arbitrate against a FINRA member "simply because he purchased [a] good or service from [that member's] 'associated person' acting on behalf of his or her own independent company[?]" *Id.*

The district court answered this question in the affirmative, and Defendants urge us to reach the same conclusion. As they note, the FINRA Code offers several clues that customers are not restricted to those who transact with FINRA members. First, as noted, the Code's own definition of "customer" is non-restrictive. *See* FINRA Rule 12100(k). That the term is defined to exclude brokers and dealers, but not defined with reference to FINRA members, hints at a broad construction. An online FINRA glossary, though not expressly incorporated by the FINRA Code, suggests the same conclusion. *See UBS Fin. Servs., Inc.*, 660 F.3d at 650. It defines an "investor"—the prototypical "customer" of a securities firm—as "[a] person or entity . . . that transacts business with any member firm and/or associated person." *Dispute Resolution Glossary*, Fin. Indus. Regul. Auth., https://www.finra.org/arbitration-mediation/about/arbitration-vs-mediation/dispute-resolution-glossary (last visited April 16, 2025). If customers are defined to include all non-brokers and non-dealers, then customers must include investors, even those that invest with associated persons.

Additional signals may be discerned from the text of Rule 12200, which makes no apparent distinction between individuals who transact with members as opposed to their associated persons. The rule first limits arbitrable claims to

those arising from disputes "between . . . customer[s] and . . . member[s] *or* associated person[s]." FINRA Rule 12200 (emphasis added). It then clarifies that these disputes may "arise[] in connection with the business activities of the member *or* the associated person." *Id.* (emphasis added). These signals suggest an intent to encompass the claims of those who transact with associated persons. Nevertheless, to the extent that the signals are truly ambiguous, because Rule 12200 "constitutes an 'agreement in writing' under the FAA," *Reno*, 747 F.3d at 739 n.1, we "appl[y] 'the federal policy favoring arbitration' when interpreting this provision." *Waterford Inv. Servs., Inc. v. Bosco*, 682 F.3d 348, 353 (4th Cir. 2012) (quoting *Aune*, 385 F.3d at 435); *see also Wachovia Bank, Nat. Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 171 (2d Cir. 2011); *Multi-Fin. Sec. Corp. v. King*, 386 F.3d 1364, 1367 (11th Cir. 2004). Applying this guidance, we resolve "any doubts concerning the scope of arbitrable issues . . . in favor of arbitration"—here, in favor of reading Rule 12200 expansively to extend to those who transact with associated persons. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24–25 (1983).

Employing similar logic, most of our sister circuits that have addressed this question have concluded that Rule 12200 applies to the customers of associated persons. The Second Circuit was an early leader in this regard. In *John Hancock*, it applied processes of statutory interpretation and construction before concluding that "the customer of an associated person, asserting a claim arising out of the associated person's business," must not be "prohibited" from "compelling a [FINRA] member to arbitrate under Rule [12200]." 254 F.3d at 59. The Second Circuit noted that Rule 12200 was "not only susceptible of [this

interpretation . . . but require[d] [it]." *Id.* It rested its conclusion in part on federal policy under the FAA, and in part on its determination that "nothing in the language of Rule [12200], or any other provision of the [FINRA] Code, . . . compel[led] . . . (or even suggest[ed])" a contrary result. *Id.*

Other federal courts of appeal followed the Second Circuit's lead. The Sixth Circuit, reasoning that "Rule [12200] [does not] require[] that defendant-investors be direct customers of [a FINRA member]," determined that "an agent or representative of a financial services firm is an 'associated person' under [FINRA] Rule [12200] such that a relationship with the agent entitles the investor to the arbitration process." *Vestax Sec. Corp. v. McWood*, 280 F.3d 1078, 1082 (6th Cir. 2002). The Eleventh Circuit has likewise affirmed that "the plain language of Rule [12200] supports the view that the term 'customer' refers to either a member's or an associated person's customer, affording customers of an associated person a right to compel arbitration against a member." *King*, 386 F.3d at 1369. The Eight Circuit, for its part, has described the "proposition that customers of associated persons of a firm may compel arbitration with the firm" as "unremarkable." *Berthel Fisher & Co. Fin. Servs. v. Larmon*, 695 F.3d 749, 753 (8th Cir. 2012). At least three other courts of appeal are in accord, *see Waterford*, 682 F.3d at 353; *Cal. Fina Group, Inc. v. Herrin*, 379 F.3d 311, 318 (5th Cir. 2004); *Miller v. Flume*, 139 F.3d 1130, 1136 (7th Cir. 1998), and Oppenheimer points to none that has reached a different conclusion.

Oppenheimer nevertheless asserts that our circuit, which has not yet addressed this question, is required by our precedent to reach a different result. As it observes, although we have never opined on whether customers include those

who transact with associated persons, we have opined on the kinds of transactions in which customers must engage. Specifically, in *Reno*, we held that "a 'customer' is a non-broker and non-dealer who purchases commodities or services from a FINRA member in the course of the member's FINRA-regulated business activities, i.e., the member's investment banking and securities business activities." 747 F.3d at 741. *Reno* involved a claimant that had employed a FINRA member as an underwriter to issue debt in the form of auction rate securities. *Id.* at 735–36. Responding to the FINRA member's assertion that the defendant "was not a 'customer' because their relationship did not relate directly to investment or brokerage services," we concluded that the defendant was a customer because the FINRA member "provided [it with] services in the course of its securities business activities." *Id.* at 739, 741.

Although *Reno* is relevant, it does not control this case because it did not raise or address the factually distinct circumstances presented here. *Reno* arose in the context of a dispute between an individual and a FINRA member, and it did not involve any associated persons. Therefore, it did not reach or resolve the application of Rule 12200 among customers of associated persons. *See id.* at 741. This rationale also explains the opinion's holding: Although *Reno* defined "customers" as those who transact with "FINRA member[s]," this definition is not comprehensive and does not foreclose the application of Rule 12200 to customers of associated persons. *Id.* The Second Circuit reached the same conclusion when asked to reconcile its decision in *John Hancock*, which focused on the customers of associated persons, with prior opinions that had focused on the customers of FINRA members. 254 F.3d at 60. As it explained, those prior opinions "d[id] not limit [the court's]

application of the [FINRA] Code to the entirely distinct set of facts presented [in *John Hancock*] any more than [the] finding that a confession is sufficient evidence of a murder forecloses a subsequent finding that the testimony of an eyewitness is sufficient as well." *Id*.

For the foregoing reasons, we hold that a "customer," for purposes of Rule 12200, includes any non-broker and non-dealer who purchases commodities or services from a FINRA member or its associated person. *Reno*, 747 F.3d at 741. This holding not only aligns with *Reno* and the rulings of our sister circuits but further serves the purposes of Rule 12200 by ensuring that access to arbitration is guided by a clear and administrable rule. As SIFMA notes, arbitration is valuable because it entails "lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 685 (2010). But if proceeding to arbitration were to require a fact-intensive analysis of "customer status," the "sprawling litigation" that would likely result could "defeat[] the express goals of arbitration to yield economical and swift outcomes." *Citigroup Glob. Mkts. Inc. v. Abbar*, 761 F.3d 268, 276 (2d Cir. 2014). The bright-line definition of "customer" contemplated here addresses this concern by ensuring that access to arbitration depends only on the question whether an individual transacted with a FINRA member or its non-clerical, non-ministerial employee. *See Reno*, 747 F.3d at 741; FINRA Rule 12200. To answer this question, "[t]he only relevant inquiry . . . is whether an account was opened or a purchase made." *Abbar*, 761 F.3d at 276.

### b. Defendants Did Not Transact with Woods.

Applying this understanding of the FINRA Code, Defendants argue that they are customers of Woods, and therefore of Oppenheimer, because they purchased stock from Woods during the time that he was employed by Oppenheimer. The parties do not dispute that Defendants are not brokers or dealers. They also do not dispute that Woods was an "associated person" of Oppenheimer at the time Defendants' claims arose because Woods was, at that time, employed by Oppenheimer in a substantive capacity. *See* FINRA Rule 1011(b). Therefore, pursuant to our understanding that FINRA Rule 12200 encompasses the claims of customers of associated persons, Defendants are entitled to FINRA arbitration so long as they can demonstrate a customer relationship with Woods.

The district court concluded that Defendants were not so entitled because they could not make the necessary showing of a customer relationship. As noted, Defendants' specific claim is that "they purchased a security"—their investments in Horizon—"from Woods while he was an associated person of Oppenheimer." However, the district court found that "there simply is no evidence of Woods' participation such that the Court could conclude he sold Defendants any commodities or services as required to be 'customers' under FINRA Rule 12200." In reaching this conclusion, the district court emphasized the level of interaction that Defendants had with Woods, the owner of Horizon and Southport, as compared with Mooney, Defendants' investment adviser at Southport. The district court concluded that Mooney was the individual from whom Defendants purchased their Horizon investments—not Woods.

We agree. As the district court noted and the record confirms, Woods did not reach out to Defendants, solicit them to purchase investments, advise them about Horizon, or send them information or logistical materials. Nor did Woods collect payment from Defendants, effectuate their investments, or earn any fees or commission on their spending. Simply put, Woods had no role in recruiting, facilitating, or causing Defendants' investments in Horizon to occur. Instead, it was Mooney, Southport's registered representative, who did all of these things. He was the individual responsible for bringing in Defendants' business, advising them about Horizon, carrying out their purchase of securities, and generally overseeing their investment. Mooney was also Defendants' sole contact as they went through the process of investing. Other than a single phone call between Woods and the Mitchells—a conversation that Mooney helped arrange, and during which Woods "backed up exactly what . . . Mooney" had already told Defendants— Defendants had no contact with Woods and communicated entirely with Mooney about their investments.[2]

---

[2] As Defendants note, the district court failed to account for this conversation when noting that "[n]one of the defendants testified that they spoke with Woods or that Woods acted as their broker or advisor in making their investments in Horizon." As described, the Mitchells did speak with Woods, and their conversation with Woods was substantive: The Mitchells "asked . . . Woods questions about the [Horizon] investment as part of [their] due diligence into the program," and Woods provided answers that encouraged the Mitchells to place their first trades. Therefore, the district court's statement that Defendants failed to "testif[y] that they spoke with Woods . . . in making their investments in Horizon" is inaccurate. Nevertheless, this error is harmless because Defendants and Woods had no other interactions that were material to their investments in Horizon. Therefore, even considering the phone

Based on this cumulative evidence, it is clear that "it was Mooney who facilitated and caused [Defendants'] investments to occur, not Woods." Mooney, unlike Woods, was not employed by Oppenheimer during the time he transacted with Defendants. [3] Therefore, because Defendants were not customers of Woods, and because the only individual to whom Defendants were customers was not an "associated person" of Oppenheimer, there is no basis to conclude that Defendants were customers of Oppenheimer. *See* FINRA Rule 12200. This would appear to resolve Defendants' claims.

Defendants nevertheless suggest one final way in which their transactions with Horizon, Mooney, and Woods might be tied to Oppenheimer. They argue that by investing in Horizon, an entity that Woods ran and controlled, Defendants effectively invested in an "alter ego" of Woods and therefore, by extension, became Woods's customers. This argument depends on the unusual suggestion that an individual may become the "customer" of an associated person of a FINRA member merely by purchasing stock in a company that the associated person owns or substantially controls. *See Ranza v. Nike, Inc.*, 793 F.3d 1059, 1073 (9th Cir. 2015).

We reject Defendants' "alter ego" theory. As a threshold matter, the district court expressly discarded this theory, both

---

interaction between the Mitchells and Woods, there is no basis to conclude that the Mitchells—or the Hoppers, who had no contact with Woods—were Woods's customers.

[3] Mooney was employed by Oppenheimer from 2007 to 2010, years before Defendants' claims arose. Defendants make no contention that Mooney's prior employment relationship with Oppenheimer renders him an "associated person" for purposes of their claims.

in connection with Defendants' motion for summary judgment and their motion for a preliminary injunction. Because Defendants do not clearly challenge that conclusion in their opening brief, it is waived. *Dennis v. BEH–1, LLC*, 520 F.3d 1066, 1069 n.1 (9th Cir. 2008). Nevertheless, even if considered on its merits, Defendants' theory is meritless. The theory lacks support from the FINRA Code and has never been considered or endorsed by any federal court of appeal. Further, the theory is not logical: If true, it would lead to the odd result that any investor who purchases stock in a company becomes the "customer" of those individuals in control of the company—and, by extension, the customer of any FINRA members employing those individuals. Because the FINRA Code clearly does not contemplate that broad result, *see, e.g.*, *King*, 386 F.3d at 1370, Defendants' "alter ego" theory is unsupported.

For the foregoing reasons, because Defendants did not transact with Woods, they are not the customers of any "associated person" of Oppenheimer. As a result, Defendants are not entitled to arbitration pursuant to FINRA Rule 12200.

## II. The District Court Did Not Abuse Its Discretion by Entering a Permanent Injunction.

Defendants next suggest that, these conclusions aside, the district court still abused its discretion by entering a permanent injunction enjoining them from arbitrating their claims. Defendants' argument relies on *eBay*, which held that a plaintiff who seeks a permanent injunction must "demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the

plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." 547 U.S. at 391.

Defendants argue that two of the *eBay* requirements are not satisfied here, but both arguments are unpersuasive because they rely on Defendants' underlying contention that they are "customers" of Oppenheimer. Defendants first argue that Oppenheimer would not be harmed by arbitrating their claims because Oppenheimer, in seeking FINRA membership, agreed to arbitrate the claims of its customers pursuant to FINRA Rule 12200. But for the reasons that have been discussed, Defendants are not customers of Oppenheimer. Therefore, Oppenheimer has no obligation to arbitrate Defendants' claims. *See* FINRA Rule 12200. Under these circumstances, the district court did not abuse its discretion by concluding that forcing Oppenheimer to submit to arbitration would cause it to suffer irreparable losses in the form of time, money, and related resources. *See McLaughlin Gormley King Co. v. Terminix Int'l Co.*, 105 F.3d 1192, 1194 (8th Cir. 1997); *Md. Cas. Co. v. Realty Advisory Bd. on Lab. Rels.*, 107 F.3d 979, 984–85 (2d Cir. 1997).

Defendants also argue that a permanent injunction is unsupported because the FAA "embodies a clear federal policy," *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 719 (9th Cir. 1999), in favor of arbitrating "valid, irrevocable, and enforceable" agreements to arbitrate, 9 U.S.C. § 2. But this argument also depends on Defendants' "customer" status because a valid "agreement to arbitrate exists only if a *customer* requests arbitration from a [FINRA] member." *UBS Fin. Servs., Inc. v. Carilion Clinic*, 706 F.3d 319, 324 n.2 (4th Cir. 2013). Because Defendants are not customers of Oppenheimer, there is no arbitration agreement between

the parties, and Defendants' suggested rationale does not apply. *See id.*  In its absence, the district court did not abuse its discretion by determining that policy disfavors forcing a party to arbitrate against its own wishes. *Id.*; *see also AT&T Techs., Inc.*, 475 U.S. at 648–49.

### III.  The District Court Did Not Err by Introducing New Legal Requirements or Reaching Erroneous Factual Findings.

Defendants finally suggest that, concerns about their own "customer" status aside, the district court further erred by introducing unsupported requirements for the legal definition of a "customer" and making factual findings that are unsupported by the record.  Both of these arguments are without merit.

Defendants first contend that the district court committed legal error by "improperly impos[ing] additional requirements beyond the definition [of 'customer'] carefully crafted by the [*Reno*] Panel."  Defendants identify only one such requirement: the district court's alleged insistence that Defendants "deal[] in person with John Woods" in order to qualify as his customers.  This argument is unsupported because the district court imposed no requirement that Defendants engage in in-person interactions with Woods.  Nevertheless, the district court did consider whether Defendants engaged in personal interactions with Woods that could be seen as consistent with a purchase-based customer relationship.  This consideration was appropriate because the "relevant inquiry" for purposes of Rule 12200 is, as noted, whether an individual practically transacted with a FINRA member or its associated person. *Abbar*, 761 F.3d at 276; *see also Reno*, 747 F.3d at 741; *King*, 386 F.3d at 1370.

Defendants also contend that the district court committed legal error by making erroneous "factual findings" regarding their interactions with Woods. Defendants specifically argue that the district court erred by finding that (1) "Defendants identif[ied] no evidence that they purchased any commodity or service from Woods" and that (2) Woods "ha[d] not been shown to have any active role in the actual purchases." As a threshold matter, it is not clear that these statements are findings of fact, as opposed to summaries of the record. Nevertheless, Defendants are correct that in granting summary judgment, a district court may make findings of fact for the "limited purpose [of] . . . pinpoint[ing] the undisputed facts supporting the summary judgment." *Swarner v. United States*, 937 F.2d 1478, 1481 (9th Cir. 1991). This process underpins the "threshold inquiry of determining whether there is the need for a trial— whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The district court properly conducted that inquiry here by assessing the undisputed evidence and concluding that it reflected no signs of a customer relationship with Woods.

## CONCLUSION

For the foregoing reasons, we conclude that a "customer," for purposes of FINRA Rule 12200, includes any non-broker and non-dealer who purchases commodities or services from a FINRA member or its associated person. Nevertheless, we find that Defendants are not customers of Oppenheimer, a FINRA member, because they did not purchase commodities or services from John Woods or any other associated person of Oppenheimer. Therefore, we agree with the district court that Defendants were not entitled to arbitrate their claims against Oppenheimer pursuant to

FINRA Rule 12200. We also affirm the district court's permanent injunction prohibiting Defendants from arbitrating their claims. Because we discern no other errors in the district court's analysis or factual findings, we affirm.

**AFFIRMED.**